LAIDLAW ENVIRONMENTAL SERVICES)
OF NASHVILLE, INC.,                      )
                                         )
      Plaintiff/Appellant,            )
                                         )    Davidson Chancery
                                         )    No.  94-2747-III
VS.                                      )
                                         )    Appeal No.
                                         )    01-A-01-9507-CH-00310
METROPOLITAN BOARD OF HEALTH   )
FOR NASHVILLE AND DAVIDSON     )
COUNTY,                        )
                               )
and                            )

**FILED**

**March 13, 1996**

**Cecil W. Crowson**
**Appellate Court Clerk**

ROBERT ORR/SYSCO FOOD SERVICES  )
COMPANY,                        )
                                )
and                             )
                                )
BRING URBAN RECYCLING TO        )
NASHVILLE TODAY,                )
                                )
      Defendants/Appellees.      )

IN THE COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE

APPEAL FROM THE CHANCERY COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

HONORABLE ROBERT S. BRANDT, CHANCELLOR

Thomas V. White
TUNE, ENTREKIN & WHITE
First American Center, 21st Floor
Nashville, Tennessee 37238

JOHN P. WILLIAMS
1900 Cedar Lane
Nashville, Tennessee 37212
ATTORNEYS FOR PLAINTIFF/APPELLANT

James L. Murphy, III
Director of Law
John L. Kennedy
Metropolitan Attorney
Liz Foster
Metropolitan Attorney
DEPARTMENT OF LAW
METROPOLITAN GOVERNMENT OF NASHVILLE
204 Metropolitan Courthouse
Nashville, Tennessee 37201
FOR DEFENDANT/APPELLEE
METROPOLITAN BOARD OF HEALTH FOR
NASHVILLE AND DAVIDSON COUNTY

GARY A. DAVIS
Post Office Box 2346
Knoxville, Tennessee 37901

Frank M. Fly
BULLOCK, FLY & McFARLAND
Post Office Box 398
Murfreesboro, Tennessee 37133-0398
ATTORNEYS FOR DEFENDANT/APPELLEE
ROBERT ORR/SYSCO FOOD SERVICES COMPANY


DAVID BORDENKIRCHER
3221 Nolensville Road, Suite 207
Nashville, Tennessee 37211
ATTORNEY FOR DEFENDANT/APPELLEE
BRING URBAN RECYCLING TO NASHVILLE TODAY


REVERSED AND REMANDED


HENRY F. TODD
PRESIDING JUDGE, MIDDLE SECTION


SAMUEL L. LEWIS, JUDGE, CONCURS;
AND WILLIAM C. KOCH, JR., JUDGE, FILES
SEPARATE CONCURRING OPINION.

LAIDLAW ENVIRONMENTAL SERVICES)
OF NASHVILLE, INC.,                )
                                   )
      Plaintiff/Appellant,     )
                                   )    Davidson Chancery
                                   )    No. 94-2747-III
VS.                                )
                                   )    Appeal No.
                                   )    01-A-01-9507-CH-00310
METROPOLITAN BOARD OF HEALTH       )
FOR NASHVILLE AND DAVIDSON         )
COUNTY,                            )
                                   )
and                                )
                                   )
ROBERT ORR/SYSCO FOOD SERVICES     )
COMPANY,                           )
                                   )
and                                )
                                   )
BRING URBAN RECYCLING TO           )
NASHVILLE TODAY,                   )
                                   )
      Defendants/Appellees.     )

## O P I N I O N

The captioned plaintiff has appealed from the judgment of the Trial Court affirming the administrative action of the captioned Board reversing the previous action of the Director of the Metropolitan Department of Health in renewing six permits previously issued for operation of a waste disposal plant. The other captioned parties initiated and prosecuted the administrative proceedings before the Board to reverse the renewal of the permits and actively defended the action of the Board in the Trial Court and this Court.

The issues presented by the parties require a thorough review of the background of the present controversy.

The subject plant was constructed in 1990 by Osco Treatment Systems, Inc. In June, 1991, the Director of Health issued six annual permits for operating the plant and the plant began operations consisting of converting hazardous wastewater. Copies of said permits are not found in the record, but it appears from the renewal licenses that various activities were

authorized to neutralize and to separate metals, oils and other toxic wastes and ship them to other disposal sites. The remaining wastewater was to be rendered non-hazardous in biological treatment tanks and discharged into the public sewer system. Annual permits for this operation were renewed in June, 1992, by the Director of Health; and Osco Treatment Systems, Inc. continued the operation.

On December 23, 1992, Osco Treatment Systems, Inc., became a subsidiary of plaintiff, Laidlaw Environmental Services of Nashville, Inc.

On February 26, 1993, the Director of the Health Department issued the following order:

THE METROPOLITAN GOVERNMENT OF NASHVILLE AND
DAVIDSON COUNTY, TENNESSEE

Acting By and Through

THE METROPOLITAN BOARD OF HEALTH

IN THE MATTER OF
THE METROPOLITAN DEPARTMENT OF
HEALTH, FREDIA S. WADLEY, M.D.,
DIRECTOR OF HEALTH,
     Complainant,
vs.                                Case No. A-93-001

OSCO TREATMENT SYSTEMS, INC.,
     Respondent.

ORDER

Pursuant to the authority of Tennessee Code Annotated Sections 68-25-101, et seq. and the Code of Laws of The Metropolitan Government of Nashville and Davidson County Chapter 10.56, the Metropolitan Department of Health ("Department") has issued the following Order:

FINDINGS OF FACT

1. OSCO Treatment Systems, Inc., ("Respondent") is the owner and/or operator of a wastewater treatment facility located at 7230 Centennial Place, Nashville, Tennessee. The Respondent is a "person" within the meaning of Section 10.56.010 of the Metropolitan Code of Laws "Code" and is thereby subject to the provisions of Section 10.56.170 of the Code.

2. On September 16, 1992, the Department received a complaint regarding odor in the Centennial Boulevard area. Upon investigation, the Department determined that the odor in question was a sulfide type and was emanating from a sodium hydrosulfide (NaHS) delivery system on Respondent's premises. According to the Respondent, the NaHS tank was filled with a substantial excess of free sulfide which had been introduced into the tank by employees of the Respondent. The ensuing chemical reaction released excess sulfide at a rate exceeding the capacity of the thermal oxidizer odor control system.

3. On numerous occasions during September and October, 1992, the Department received complaints of, and did, in fact, detect, odors in the Centennial Boulevard area. Upon investigation, the Department determined such odors were being generated by bio-sludge stored in various roll-off boxes located on Respondent's premises. Such fact was confirmed by employees of the Respondent.

4. The Respondent was acquired by Laidlaw Environmental Services, Inc. on December 23, 1992. On the date of acquisition there were approximately ninety roll-off containers which held odiferous bio-sludge material on site.

The order also contains the following:

CONCLUSION OF LAW

1. Respondent has violated Section 10.56.170 of the Code on repeated occasions.

ORDER

IT IS ORDERED that the Respondent is hereby assessed a civil penalty in the amount of One Hundred Fifty Thousand and No/100 Dollars ($150,000.00) for violation of Section 10.56.170 of the Metropolitan Code of Laws. Said penalty shall be paid by certified check, payable to the order of the Metropolitan Department of Health, within thirty (30) days of the executed date of this CONSENT AGREEMENT and shall be mailed or delivered to: . . . .

On April 2, 1993, the Director issued an "Amendment" to the February 26, 1993, order containing the following:

AMENDMENT TO ORDER ASSESSING CIVIL PENALTY

Comes the Director of Health to amend the Order issued on February 26, 1993, assessing a civil penalty in the above-styled matter, by deleting paragraph 3 of said Order and in its place substituting the following paragraph 3.

3. In addition to the incident referenced above, the Department received numerous complaints

of, and staff members did in fact, detect, odors
in the Centennial Boulevard area on the
following dates in October, 1992; December,
1992; January, 1993; February, 1993; and
March, 1993:

October 5, 1992
October 8, 1992 (two occasions)
October 9, 1992
October 13, 1992 (two occasions)
October 15, 1992
December 1, 1992 (two occasions)
December 2, 1992
December 15, 1992
December 17, 1992
January 21, 1993
February 12, 1993
February 16, 1993

Upon investigation, staff members of the Health Department
determined that the odors originated in bio-sludge stored in
various roll-off boxes located on Respondent's premises.  The
origin of the odors detected in October, 1992, was confirmed
by employees of the Respondent.

THE METROPOLITAN GOVERNMENT OF NASHVILLE AND
DAVIDSON COUNTY DEPARTMENT OF HEALTH

/s/_____
          FREDIA S. WADLEY, M.D.
          Director of Health

Dated: April 2, 1993

On April 28, 1993, plaintiff applied for renewal of the six permits for operation of the

plant.  On June 28, 1993, after inspection of the plant, the Director of Health renewed the

permits.

Each of the six permits describes a specific "Emission Source" and specific

"Emission Points" with specified conditions of operation.  A copy of Permit No. 6-1, is

attached to this opinion as "Exhibit A."

On July 26, 1993, and July 28, 1993, the second and third captioned appellees

appealed to the Board to reverse the renewal of the permits.  The Board adopted the contested

case provisions of the Uniform Procedures Act, T.C.A. Section 7-7-105, and requested an Administrative Law Judge (ALJ) to preside over the proceedings.

On November 8, 1993, prior to the administrative hearing, a "consent agreement" was approved by the Board. The agreement was signed by the Director of Health and the president of Osco Treatment Systems, Inc. It contains the following caption and "Factual Background:"

> IN THE MATTER OF
> THE METROPOLITAN DEPARTMENT OF
> HEALTH, FREDIA S. WADLEY, M.D.,
> DIRECTOR OF HEALTH,
>
>     Complainant,
>
> V.
>
> OSCO TREATMENT SYSTEMS, INC.,
>
>     Respondent.
>
> . . . .
> ### FACTUAL BACKGROUND
> 1. Respondent became a subsidiary of Laidlaw Environmental Services, Inc., effective December 23, 1992.
>
> 2. Operational control of Respondent was assumed by its current management in early 1993.
>
> 3. Respondent's current management has taken a number of steps to minimize the potential emission of odors from the facility. These steps have included the following:
>
>     A. Respondent has undertaken an ongoing comprehensive review of the facility and its operations.
>
>     B. Approximately 90 rolloff boxes containing biosludge, which were on the premises when Respondent's current management assumed control, were removed by Respondent. The removal was completed three weeks in advance of the date promised to the Department by current management. Biosludge is a potential source of odors. This accelerated removal cost about $51,000.00 in addition to the normal removal expense.
>
>     C. Since about February 1993, biosludge has been accumulated for a shorter period of time than before, and shipped offsite for final disposal more frequently. Respondent has incurred more than $300,000.00 in additional expense (through July

1, 1993) resulting from these more frequent shipments.

D. Respondent installed an air sparger for the equalization tank at a cost of more than $13,000.00.

E. Respondent has added hydrogen peroxide and powdered activated carbon to the biological treatment tanks as a part of its routine wastewater processing procedures.

F. Respondent has retained consultants to assist it in addressing the potential for emission of odors from the facility.


The agreement also contains the following:

1. This Consent Agreement constitutes a full and final settlement of all complaints alleging violations of Code §10.56.170 by Respondent through the date of this Consent Agreement.

. . . .

3. The Department has taken the cost to Respondent of past and future remedial measures into account in determining an appropriate penalty and corrective measures incorporated into this Consent Agreement.

4. Respondent will pay a civil penalty to the Department in the amount of eighty thousand dollars ($80,000.00) to settle the allegations of the order. . . .

5. Respondent will purchase, install, and operate a new two-stage scrubber for the biological treatment tanks to replace the existing scrubber. . . . The estimated project cost of purchasing and installing this scrubber is a minimum of $90,000.00. . . .

. . . .

7. Respondent will install a new multi-stage scrubber to serve certain tanks known as the T-1, T-14, T-15, T-18, and T-19 tanks. . . . The estimated project cost of purchasing and installing this scrubber is $250,000.00.

8. . . . As long as Respondent is proceeding in a manner which reasonably may be expected to result in completion of the agreed actions by the target dates, and otherwise is in compliance with this Consent Agreement, Respondent shall be deemed to be in compliance with Code §10.56.170. . . .

9. After the completion of the compliance schedule referred to in the preceding paragraph, as long as the equipment installed by Respondent pursuant to this Consent Agreement is in good working order and is in normal operation, Respondent shall not be subject to enforcement action under Code

§10.56.170 unless and until Code §10.56.170 is substantially amended. . . .

On April 4, 1994, plaintiff moved the Administrative Judge to dismiss the appeal from the order of the Director renewing the permits on the grounds of the Consent Order. On April 5, 1994, the motion was overruled.

On June 15, 1994, after a hearing on the merits of the appeal, the Board voted 4 - 1 to reverse the renewal of permits granted by the Director on June 28, 1993. On July 12, 1994, the Board approved written findings of fact and conclusions of law under the following caption:

BEFORE THE METROPOLITAN BOARD OF HEALTH
OF THE METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

ROBERT ORR/SYSCO, INC.
And
BRING URBAN RECYCLING TO NASHVILLE
TODAY (BURNT)
   Petitioners,

V.           No. 43.01-34-0597J

OSCO TREATMENT SYSTEMS, INC.,
   Respondent.

The findings of fact include the following:

Background

. . . 12. Under the current zoning regulations activities in Industrial Restrictive Districts, such as OSCO, must be performed in enclosed buildings. At OSCO, sources of some of the offensive odors, the waste storage and treatment tanks, are not in enclosed buildings [IV-75-76].

Impact of OSCO on Neighboring Businesses and Institutions

13. During the period April 1, 1991, to March 24, 1994, there were at least 131 air pollution complaints to the Metropolitan Health Department from neighbors of OSCO concerning air pollution from the OSCO facility. Of the total of 131 complaints, 90 (70%) of those complaints were received after

January 1, 1993, when Laidlaw began operating the OSCO facility.  [II-142; Ex. S-6].

. . . .

15.  Of the 131 documented air pollution complaints received by the Metropolitan Health Department, the presence of an odor from OSCO was confirmed by a Metropolitan inspector or was confirmed by OSCO's own admission for at least 82 of the complaints.  [Ex. S-5, 6].

. . . .

Objectionable Odors from the OSCO Facility

20.  When the original air pollution permit application was pending for the OSCO facility, OSCO's consultant, Resource Consultants, Inc., assured the Director of the Bureau of Environmental Health Services of the Metropolitan Health Department that there would be no odor problems.  (VI-144-147; VII-129-131)

21.  Instead, in the three years that the facility has been operating, there have been 40-50 emissions of objectionable odors beyond the property line which were considered to be violations of Section 10.56.170 of the Air Pollution Code (Emission of Gases, Vapors, or Objectionable Odors) by the Metropolitan Health Department.  [VI-140].

. . . .

23.  . . .  There have been at least nineteen days since January, 1993 when the Metropolitan Health Department found objectionable odors emitted by OSCO beyond the property line that met the standard set out in Section 10.56.170.  [VI-141].

. . . .

32.  OSCO maintained log sheets of pH measurements of the scrubbing liquid in the bioscrubber.  During the two-year period from April, 1991, to April, 1993, there were at least 296 readings that were below a pH of 9.0, each of which constituted a violation of the operating permit.  On several days the pH was permitted to remain well below 9.0 for hours at a time.  [II-136-139; VI-44; VI-164; Ex. S-13].  In addition, in 1993 OSCO allowed the pH in the bioscrubber to fall below 9.0 more than two times in January, 1993, once in March, 1993, once in April, 1993, and once in September, 1993.  [VI-27; 44-45]. . . .

. . . .

34.  OSCO has agreed to replace the ineffective bioscrubber with a new thermal oxidizer.  This thermal oxidizer, however, will not solve all of the odor problems from the biological treatment units, since there would not be an effective backup control device for the times when the thermal oxidizer

malfunctions or is out of service for maintenance. The biological treatment units cannot be simply turned off when this occurs because of the necessity to keep the bacteria alive, and odors would continue to be generated. [II-148; IV-134].

. . . .

36. The only backup planned for the proposed new thermal oxidizer is a scrubber. As with the existing bioscrubber, such a backup scrubber would not be very effective at removing odors. [IV-135].

. . . .

38. There was no testimony by any expert witness that the proposed thermal oxidizer would eliminate all objectionable odors emitted from the OSCO facility. . . .

39. OSCO has not demonstrated the ability to properly operate the relatively simple air pollution control equipment that it currently has at the plant. It is likely that operational problems will increase with the more technically sophisticated and difficult-to-operate equipment that OSCO is planning to install. [III-49-50].

40. Another source of odor from the OSCO plant is the filter press area, which filters odorous sludge from the biological units and is in an open building without any air pollution control devices. [IV-120].

41. The storage of rolloff boxes containing sludge from the biological units is also a potential source of odor, which is somewhat mitiated when they are covered. [IV-121]. These rolloff boxes have been the source of odor complaints in the past. (Ex. S-5)

42. Another source of odors is overflow of foam and liquid from the biological treatment units, which have frequently overflowed through foaming into the dike around the tanks producing a biological sewer odor that would not be routed through the new thermal oxidizer. [III-88].

43. The odor problems with the OSCO facility have not been solved by Laidlaw Environmental Services since it acquired OSCO. [VI-142]. It is likely that there will be objectionable odors from the OSCO facility in the future, even with the installation of a new thermal oxidizer. [II-149]. The thermal oxidizer to be installed on the biological treatment units will not address odors from the filter press area or the roll-off boxes or any other fugitive emissions from the facility. [IV-131].

44. OSCO has accepted numerous shipments of hazardous waste with very strong odors as determined by OSCO laboratory personnel. [VI-33-40]. Hazardous waste codes D001 and D002 were those that were most frequently designated as having very strong odors. [VII-263]. These

include shipments accepted for treatment in parts of the plant without air pollution controls. Many of these shipments with very strong odors are from other Laidlaw facilities. [VI-33-40].

45. Toxic waste disposal plants like OSCO cannot operate anywhere without potentially creating odors, and OSCO therefore needs a more remote site with a buffer zone to reduce the impact on neighboring businesses. [III-54]. The lack of a buffer zone contributes to OSCO's odor violations. [IV-154].

46. OSCO's own consultant, Resource Consultants, Inc., which confidently predicted that there would be no odor problems before the facility began operation, is unable to state, even with the proposed addition of new odor controls, that odors from OSCO will not be a problem in the future. [VII-148].

Emissions of Volatile Organic Compounds

47. The OSCO facility accepts hazardous and other industrial waste with volatile organic compounds (VOCs), some with over 4-5% volatile organic compounds, and some of which have thousands of parts per million of benzene, which is a carcinogen. OSCO also accepts hazardous waste with volatile organic compounds that are chlorinated solvents, many of which are carcinogens. [VII-115; II-152].

48. Odors from the OSCO facility are related to VOCs emissions, since odor-causing compounds are for the most part VOCs. [III-23].

49. OSCO has a thermal oxidizer in place for the control of VOCs emissions from certain storage and treatment tanks at the facility, but not all of the VOCs emissions from the OSCO facility are routed to the thermal oxidizer. VOCs emissions from the biological system are routed to the bioscrubber, as discussed in the section above, and there are several sources of fugitive emissions not controlled by any air pollution control device. [II-135].

50. The drum storage and drum decant building, where drums are stored and unloaded into tanks, does not have any air pollution controls. Also, in the same building is the chemical fixation system, where certain liquids and sludges are mixed with cement material for solidification. Volatile organic compounds emitted from these operations are not controlled and are released to the atmosphere. [II-125-128].

. . . .

55. The OSCO 1993 operating permits at issue in the hearing control volatile organic compound emissions only through a calculation of emissions based upon the amount of VOCs in waste processed at the facility. There is no direct measurement of VOCs emitted, and the calculations are done once per year by OSCO's consultants, in spite of the fact that the operating

permits have daily and hourly limits on VOC emissions. [II-149]. OSCO does not report to Metro on compliance with daily VOC throughput limits, only annual. [VII-112-113].

56. No VOCs monitoring from emission points or in ambient air is required by the permits. [VI-147]. The permits do not specifically regulate the emissions of any toxic chemicals, including benzene. [VI-147].

57. The permit requirement for analyzing VOCs in incoming waste is unclear and has not always been followed by OSCO. [V-33; Ex. S-20]. Waste shipments have been unloaded prior to determining the pounds of VOCs contained in them for determination of compliance with daily throughput limits. [VI-45-46; Ex. S-30].

. . . .

59. The 1993 operating permits do not adequately control emissions of volatile organic compounds and particularly do not adequately control emissions of volatile organic compounds that are carcinogenic. [II-160-161].

Hazardous Waste Accepted by OSCO

60. OSCO accepts both drums of hazardous waste and bulk shipments. Drums of hazardous waste come to OSCO by truck. Bulk hazardous waste comes to the OSCO facility by rail tanker and by truck tanker. [II-123; 125-126; 130-132; Ex. S-12]. Although the hazardous waste permit for the OSCO facility allows only two rail cars to be present on the OSCO facility at any given time, several more are stored at any time on the rail siding immediately adjacent to the OSCO facility. [I-146; II-130-132; Ex. S-12; Ex. S-1].

61. Under its hazardous waste permit OSCO is permitted to accept virtually every type of hazardous waste from any location. . . .

. . . .

76. The August 25, 1993, nitrogen dioxide release from tank T-1 created a large orange cloud that extended far above the OSCO facility and migrated off the plant site. [Ex. S-2, 16]. The small scrubber on tank T-1 was overwhelmed by the gas, and much of the gas exited from the top of the tank instead of the scrubber. [III-139; V-110; Ex. S-16].

. . . .

90. In order to prevent sudden releases of toxic chemicals, such as those that have occurred at OSCO, it is normal practice in the chemical industry and in the hazardous waste industry to have a formalized preventative maintenance program, which OSCO does not have. [III-158]. Although OSCO may have commenced the development of a preventative maintenance

program since the beginning of the hearing of this appeal, it is not yet fully documented.  [V-26].

. . . .

94.  The OSCO facility as it is currently operated is not a safe operation.  There are many potential accidents that can occur that would release toxic chemicals.  [III-159-160].

. . . .

Monitoring for Compliance

104.  Monitoring of emissions for compliance with permit limits for the OSCO facility is technically and economically feasible and is the trend under the federal Clean Air Act Amendments of 1991.  It is required in some permits now in the State of Tennessee.  [VII-252-254; 271-272].

105.  Continuous stack monitoring was available in June 1993.  [III-25-27].  Continuous monitoring devices are sufficiently sensitive to monitor for odor causing compounds.  [III-63].

106.  Other air pollution permits in the State of Tennessee include odor restrictions and specific limits on and monitoring requirements for odor causing compounds.  [VII-256-257].

107.  Continuous fenceline monitoring, where a monitoring device detects low levels of chemicals in the ambient air at a facility property boundary, is technically and economically feasible for OSCO.  [VII-252; VII-265-266].

108.  None of these conditions in a permit for a waste management facility would be a new precedent.  [VII-281].

Conclusions of Law

. . . .

5.  Section 10.56.170 of the Air Pollution Chapter states:

> No person shall cause, suffer, allow or permit any emission of gases, vapors, or objectionable odors beyond the property line from any source whatsoever which causes injury, detriment, nuisance or annoyance to any considerable number of persons or to the public, or which causes or has a natural tendency to cause injury or damage to business or property.

6.  Odor falls within the definition of air pollution in the Tennessee Air Pollution Control Act, and it is within the Board's authority to regulate odor emissions.  Tenn. AG. Op. No. 83-299.

The conclusions of law include the following:

> 7. Section 10.56.170 is valid without the promulgation of regulations for its implementation and is not unconstitutionally vague or overbroad. It is within the experience and expertise of the Metropolitan Health Department to enforce this provision through consideration of complaints from the public and verification by Metropolitan inspectors of the source, nature, and intensity of emissions.
>
> . . . .
>
> 12. By allowing the pH of the bioscrubber to fall below 9.0, OSCO has violated Operating Permit Number 6-4 over 300 times in its three years of operations.
>
> 13. Under the air operating permits reissued to OSCO on June 28, 1993, compliance with the requirements of Section 10.56.170 of the Air Pollution Chapter is specifically required in the permits. By violating Sections 10.56.170 OSCO has also failed to comply with the provisions of its operating permits.
>
> 14. Based upon the design, constructions, and operation of the OSCO facility, and the types of hazardous waste that OSCO accepts and is permitted to accept, it is likely that OSCO will operate in violation of the Air Pollution Control Chapter in the future.

The decision of the Board reads as follows:

> WHEREFORE, the Metropolitan Nashville and Davidson County Board of Health hereby reverses the decision of the Metropolitan Health Department approving the OSCO Treatment Systems, Inc., application for Operating Permits Number 6-1 through 6.5. These operating permits are considered void and of no effect as of the effective date of this Order.

On the same date, plaintiff filed a motion for stay supported by an affidavit that plaintiff had spent or obligated itself for payment of $2,679,302 in good faith compliance with the "Consent Agreement" approved by the Board on November 8, 1993. The Board denied the stay.

Upon filing of petition for judicial review, plaintiff again applied for stay supported by affidavit of the Director of Health that:

> Since the installation of the new air pollution control equipment at the Laidlaw facility, it is my opinion that the

facility will pose no risk to human health which is greater than that posed by several other facilities in Cockrill Bend. It is also my opinion that the likelihood of odors has been reduced substantially by the addition of this new equipment.

Stay was granted and continued during this appeal.

As stated above, the Trial Court affirmed the action of the Board. On appeal, plaintiff presents the following issues:

> 1. Whether the Trial Court erred by holding that it was not arbitrary and capricious for the Metropolitan Board of Health to revoke Laidlaw's permits even though the Board had ordered Laidlaw to install expensive new air pollution control equipment just eight months earlier.
>
> 2. Whether the Trial Court erred by holding that the applicable section of the air pollution control ordinance for Nashville and Davidson County is not unconstitutionally vague.
>
> 3. Whether the Trial Court erred by holding that the Board's choice of remedies was not arbitrary, capricious, or abusive of its discretion.
>
> 4. Whether the Trial Court erred by holding that the Board correctly applied §10.56.040(A) of Nashville's air pollution control ordinance to the facts of this case.
>
> 5. Whether the Trial Court erred by holding that the Board's decision was not made upon unlawful procedure even though the Director of the Metropolitan Department of Health made no effort, during the proceedings before the Board, to defend her decision to issue the permits to Laidlaw.
>
> 6. Whether the Trial Court erred by holding that the Board's reliance upon the location of the Laidlaw facility as a basis for its decision was not arbitrary, capricious, or illegal.

The Board presents and plaintiff discusses the issue of whether this judicial review is governed by the Administrative Procedure Act, T.C.A. §4-5-322, or certiorari as provided by T.C.A. §27-8-101. The question was presented to the Trial Judge who ruled:

> It is unclear whether judicial review of the Board's decision is governed by the UAPA, T.C.A. § 4-5-322, or by the common law writ of certiorari, T.C.A. § 27-8-101. By its own terms, the UAPA applies only to judicial review of state agency decisions. But in 1994, the Tennessee General Assembly passed a law that permits Metropolitan Government boards and commissions to conduct contested case hearings "substantially in accordance

-16-

with the contested case provisions" of the UAPA. The legislature did not, however, specify whether the UAPA's judicial review standards or the common law certiorari standards should apply to appeals from Metropolitan Government's UAPA-conducted contested case decisions.

There is a difference between the standards. Under the UAPA, the agency decision must be supported by "substantial" evidence. T.C.A. § 4-5-322(h). Under common law certiorari, the agency decision need only be supported by "any" evidence. *Tennessee Cartage Co. v. Pharr,* 199 S.W.2d 119, 120-21 (Tenn. 1947). The difference between the two standards, though subtle, can be important when there is a dispute over the sufficiency of the evidence.

In this case though, the distinction between the two standards is not important. Laidlaw attacks the Board of Health's decision not to renew its permits on a number of grounds, but sufficiency of the evidence is not one of them. In its brief, Laidlaw does not raise the issue. Therefore, this court does not need to decide whether the UAPA's "substantial" evidence standard or certiorari's "any" evidence standard applies. In other respects, the standard of review under both types of review is the same.

T.C.A. Section 7-7-105, provides as follows:

(a) In lieu of appointing a hearing officer as authorized hereinabove, any county having a metropolitan form of government and a population of over four hundred fifty thousand (450,000) according to the 1990 census or any subsequent federal census is empowered to contract with the secretary of state for use of administrative law judges, duly appointed pursuant to § 4-5-102(1), on a case-by-case basis to conduct hearings on any matters appealed to boards and commissions of the county.

(b) Any appeal conducted by an administrative law judge under this section shall be conducted substantially in accordance with the contested case provisions of the Uniform Administrative Procedures Act compiled in title 4, ch. 5, part 3. The board or commission that considers such appeals shall promulgate rules which specify the provisions of the Uniform Administrative Procedures Act compiled in title 4, ch. 5, part 3 applicable to such appeals.

Nothing is found in the quoted statue to authorize the judicial review of administrative actions under T.C.A. Section 4-5-322, which is applicable only to state agencies. T.C.A. § 4-5-102(2).

Accordingly this judicial review of the decision of a municipal agency is by certiorari as provided by T.C.A. § §27-8-101, *et seq,* and or §§ 27-9-101, *et seq. McCallen v. City of Memphis,* 1990, 786 S.W.2d 633; *Wheeler v. Memphis,* Tenn. App. 1984, 685 S.W.2d 4. The Board's action may be invalidated when it is "illegal, arbitrary or capricious," *McCallen v. City of Memphis, supra.* The reviewing court is required to determine whether there is any material evidence that supports the action of the administrative agency. *Lansden v. Tucker,* 204 Tenn. 388, 321 S.W.2d 795 (1959).

Plaintiff's first and third issues, above, assert that the decision of the Board to "revoke" the plaintiff's permits was arbitrary and capricious. The Board did not "revoke" plaintiff's permits. It reversed the renewal of the permits as granted by the Director on June 28, 1993.

Some consideration must be given to the change of ownership of the plant on December 23, 1992. Even though the change in ownership resulted in the continuation of existence of Osco Treatment Systems, Inc., as a subsidiary of plaintiff, the record shows convincingly that, upon the assumption of ownership by plaintiff, changes and improvements were begun. Shortly after the transfer, plaintiff removed an accumulation of "roll-off boxes" of waste, sent them to another state, and reduced the number of roll-off boxes permitted on the premises to three. The Director of air pollution control of the Health Department testified without contradiction and the Board found that the accumulation of roll-off boxes was the principal cause of the odor complaints. Plaintiff undertook other corrective measures which were effective but inadequate to satisfy the Board.

It is not denied that employees of neighboring industries suffered ill effects from the discharge of gases from the subject plant. It is not asserted that the plant is without fault in design or operation. However, it is clear and uncontroverted that on November 8, 1993, the

Board approved, (i.e. joined in) a settlement agreement which bound plaintiff to make expensive improvements in the plant and agreed that:

> As long as respondent is proceeding in a manner which may reasonably be expected to result in completion of the agreed actions by the target dates, and otherwise is in compliance with this Consent Agreement, respondent shall be deemed to be in compliance with Code § 10.56.170.

This record contains no evidence that plaintiff has not "proceeded in such a manner which may reasonably be expected to result in completion of the agreed actions by the target dates" or is not "otherwise in compliance with the Consent Agreement." Therefore, for purposes of this action, plaintiff must be "deemed to be in compliance with Code §10-56-170," which is the applicable air pollution ordinance.

Moreover, the issue before the Board was not whether the six permits should be revoked, but whether to reverse the June 28, 1993 renewal of existing permits. The criteria for issuance and renewal of permits is set out in pertinent parts of §10.56.040 of the "Nashville Air Pollution Control Ordinance" as follows:

**Operating permit.**

A. After the construction permit has been issued and it is demonstrated to the satisfaction of the director that the fuel-burning equipment, incinerator, process equipment, control device or any equipment pertaining thereto can be operated in compliance with this chapter, an application for an operating permit shall be filed in duplicate in the office of the director on forms adopted by the director and supplied by the metropolitan health department. If the director determines that the source does or will operate in violation of this chapter, or if the source will operate so as to prevent attainment or maintenance of any lawful national ambient air quality standard, he shall either impose conditions on the face of the operating permit that, in his opinion, will promote compliance with this chapter, or he shall deny the application for an operating permit. . . .

B. The operating permit shall be issued for a one-year period or for such longer period as the director may designate but not to exceed five years. Applications for renewal of the operating permit shall be made in writing upon forms furnished by the metropolitan health department and shall be made not less than sixty days prior to expiration of the certificate for which renewal is sought. Disclosures of information, tests and other prerequisites to the issue of a construction permit, temporary

> operating permit, or operating permit may be required by the
> director prior to the renewal of an operating permit.
> (Emphasis supplied.)

Presumably, when the Director renewed the permits on June 28, 1993, she determined that the "source does or will not operate in violation of this chapter." In order to reverse the action of the Director, it would be necessary for the Board to find that "the source" did, on June 28, 1993, or would thereafter "operate in violation of this chapter." During the pendency of this proceeding, and prior to its decision, the Board joined in a Consent Agreement establishing compliance with this chapter by compliance with the terms of the Consent Agreement. For this reason, the Board acted arbitrarily, capriciously, without factual justification illegally in reversing the renewal of the permits.

This conclusion is based upon justice and fair dealing. Even though the Board acted out of a zealous care for the comfort and safety of individuals in the vicinity, the effect of its action was so inconsistent with fairness and justice as to be unconscionable and irrational. To enter into a solemn compact promising amnesty in exchange for $2.5 million worth of plant improvements, and to abrogate the terms of that compact before it can be carried out under its terms is not within the bounds of decency and justice.

This is not to say that the public or the Board is without means of relief from violations of the air pollution ordinance.

The Board improperly dealt with six permits as if they were one permit. Each permit allowed the use of a particular outlet for gases into the atmosphere.

Under the provisions of the Air Pollution Control Ordinance, quoted above, it was the duty of the Director and, upon appeal, of the Board to evaluate the facts relating to each permit separately and to make separate determinations of whether the equipment authorized by that permit "can be operated in compliance with this Chapter." Following such

determination, a separate conclusion was required as to whether to renew the particular permit, to impose additional conditions of operation, or to refuse renewal of the particular permit for stated reasons.

The record does not reflect whether this process was followed by the Director, but the record plainly reflects that this process was not followed by the Board. Instead, the Board chose to determine generally that the operation of the plant should be terminated by refusing renewal of all permits.

Moreover, reasonable procedure would require that the operators of the plant be placed on notice of deficiencies and allowed reasonable time to correct deficiencies before refusal to renew a permit. The Board had the inherent right and duty to monitor and regulate the operation of the processes and equipment producing the gases discharged through each permitted outlet. The record indicates that this duty was not performed, but that the principal means of monitoring was complaints from the public of offensive odor.

The record indicates and the Board found that a major cause of pollution was the "P.H." (acid-alkali balance) of the liquid in various processing tanks was not adequately monitored or maintained. This factor was remediable by the addition of a condition to the appropriate permits to require responsible monitoring and control of PH by an employee of the Board at the expense of plaintiff.

Other objectionable emanations were shown to be amenable to monitoring and control by an employee of the Board at the expense of the plaintiff.

"Conditions on the face of the permit" could have required that the permittee bear the expense of necessary monitoring for the daily information of the Board. Any unacceptable level of discharge of dangerous product would justify the suspension of operations producing

the excessive discharge until the cause was corrected.  This action would affect only the permit of the involved outlet and not the operation under the other five permits.

It has been well said that it is seldom necessary to burn a barn to get rid of its rats.

It is true that the administrative proceeding in which the "Consent Agreement" was made was not, technically, the proceeding under review in this appeal.  However, the two proceedings were contemporaneous, related to the same subject matter, the same parties and the same purposes, and, for the most part, the same improper discharges from the plant.  Furthermore, by its express terms, the "Consent Agreement" in one case stipulated facts which were determinative of the other.

The disposition of this appeal is without prejudice to reasonable measures by the Board and its staff  to discover, correct and prevent the illegal discharge of pollutants by plaintiff.

The foregoing discussion of the first and third issues is dispositive of this appeal and the remaining issues are therefore pretermitted.

The action taken by the Board is not the only relief available to the neighboring property owners and/or those individuals endangered or injured by the wrongful discharge of pollutants into the atmosphere.  The disposition of this appeal will not prejudice the rights of any injured party to recourse by an action for injunction and/or damages.

Plaintiff's second issue asserts that Metropolitan Code §10.56.170 is unconstitutionally vague.  Said Section reads as follows:

**Emission of gases, vapors or objectionable odors.**

No person shall cause, suffer, allow or permit any emission of gases, vapors or objectionable odors beyond the property line

-22-

from any source whatsoever which causes injury, detriment, nuisance or annoyance to any considerable number of persons or to the public, or which causes or has a natural tendency to cause injury or damage to business or property. (Prior code § 4-1-10)

Plaintiff asserts that the general term, "objectionable," without definition renders the section vague. The text of the section supplies adequate definition of the word, "objectionable."

Plaintiff cites authority for the obscurity of the words "detriment," and "annoyance" but this Court is satisfied that the words include the qualifying adjective, "unreasonable," so as to pass constitutional muster.

Plaintiff's fourth issue challenges the application of Metropolitan Code § 10.56.040(A) (quoted above) to the facts of this case.

If the Director (and on appeal, the Board) determines that "the source" does or will operate in violation of the ordinance, the Director (or Board) is required to impose suitable conditions on the face of the permit or deny it entirely. Subsection B of the quoted section provides for renewal upon the "prerequisites to the issue of a construction, temporary operating or operating permit." The present appeal relates to applications for renewal which, according to subsection (B), are subject to the same conditions as prescribed in Subsection A for the issuance or denial of an original permit.

Plaintiff argues that the ordinance does not require absolute guarantee against any accidental discharge of odors. The ordinance must be interpreted and applied reasonably. Thus, the words "does or will operate in violation of this chapter" refers to reasonable apprehension of present or future violations; and "impose conditions . . . or . . . deny" authorize such actions in reasonable conformity with the facts and circumstances, which

include the "Consent Agreement," which stipulated certain extensive improvements on agreed conditions.

Plaintiff's fifth issue asserts that the procedure of the Board was unlawful because the Director failed to defend her decision to renew plaintiff's permits. Even though it may be the general practice of subordinate administrators to defend their actions upon appeal to higher administrative authority, no rule of law is cited or known to this Court which would require such practice or grant any relief for the failure to follow such practice. Moreover, it does not appear that plaintiff raised the issue before the Board. *See In Re: Billing and Collection, Tariffs of South Central Bell, Tenn. App. 1989, 779 S.W.2d 375.*

Plaintiff's sixth and last issue asserts that the Board improperly acted on the ground that plaintiff's plant was improperly located in spite of its location in a zone in which such plants are permitted and in spite of the approval of the location by the Tennessee Department of Environment and Conservation.

The "Findings of Fact and Conclusions of Law" by the Board contains a section entitled "Reasons for Decision" which in turn contains the following:

> . . . 2. Section 10.56.100 of the Air Pollution Chapter directs the Board to consider in the exercise of its powers such pertinent facts and circumstances, including but not limited to:
>
>> A. The character and degree of injury to, or interference with, the protection of the health, general welfare and physical property of the residents of the Metropolitan Government area;
>>
>> B. The social and economic value of the air pollutant source;
>>
>> C. The degree of detrimental effect of the air pollutants upon the achievement of the national ambient air quality standard for such pollutant;
>>
>> D. The technical practicability and economic reasonableness of reducing or eliminating the emission of such air pollutants;

E.  The suitability or unsuitability of the air pollution source to the area in which it is located; and

F.  The economic benefit gained by the air pollutants source through any failure to comply with the provisions of this Chapter and regulations adopted pursuant to this Chapter.

3.  The Board has considered its responsibilities and the factors listed above and notes that paragraphs A and E are particular reasons for its decision.  It is obvious that the OSCO facility cannot operate in its location without unreasonably interfering with the other businesses and institutions in Cockrill Bend.

The quoted portions of the ordinance are prefaced by the following:

In the exercise of its powers to prevent, abate and control air pollution, the Board shall give due consideration to such pertinent facts and circumstances including, but not limited to:

The Board is clearly authorized to consider the location and surrounding area of the source of pollution "in exercising its powers," but the exercise of its powers must be reasonable.  This Court has determined that the reversal of renewal of all permits for operation was not a reasonable exercise of the powers of the Board under the circumstances.  The "consideration" of the location and surroundings of the plant was not unreasonable, but severity and unfairness under the circumstances rendered the decision of the Board unreasonable.

For the foregoing reasons, the judgment of the Chancellor affirming the action of the Board is reversed and vacated.  The action of the Board in reversing the renewal of plaintiff's six operating permits is reversed and vacated without prejudice to other remedial actions which the Director or the Board may see fit to assure plaintiff's lawful operation under its permits.  All costs, including costs of this appeal, are assessed to the Board.  The cause is remanded to the Trial Court for entry and enforcement of a judgment in conformity herewith.

Reversed and Remanded.

_____
HENRY F. TODD
PRESIDING JUDGE, MIDDLE SECTION

_____
SAMUEL L. LEWIS, JUDGE, CONCURS

WILLIAM C. KOCH, JR., JUDGE, FILES
SEPARATE CONCURRING OPINION.