IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 25, 2022 Session

## VIRGINIA CRAWLEY v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY TENNESSEE ET AL.

Appeal from the Chancery Court for Davidson County
No. 19-906-I       Patricia Head Moskal, Chancellor

_____

### No. M2021-00210-COA-R3-CV
_____

This appeal arises from the dismissal of a petition for writ of certiorari challenging a decision by a city's planning commission. The petitioner contends that the planning commission's approval of modifications to a site plan for a planned unit development district were not minor, such that the proposed amendments should have been referred to the city's council for consideration. The trial court ultimately determined that the modifications were minor and did not require referral to the council; accordingly, it dismissed the petition. We concur in the conclusion of the trial court and affirm its judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Gina R. Crawley, Nashville, Tennessee, for the appellant, Virginia Crawley.

Paul Jefferson Campbell, II, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County.

Thomas V. White and George A. Dean, Nashville, Tennessee, for the appellee, Ole South/Craighead Joint Venture.

Emma B. Elliott and Thomas T. Pennington, Nashville, Tennessee, for the appellee, The Ridge at Antioch, Limited Partnership.

**OPINION**

This appeal involves a certiorari review of a decision by the Planning Commission of the Metropolitan Government of Nashville and Davidson County, Tennessee ("Planning Commission"). Petitioner Virginia Crawley challenges the Planning Commission's approval of a revision to the preliminary plan for a portion of a planned unit development ("PUD") district[1] called Forest View Park, in which she lives. Forest View Park is an 86-acre tract off Murfreesboro Pike in Davidson County that features single- and multi-family dwellings. The development has been completed in phases since it was initially approved by the council of the Metropolitan Government of Nashville and Davidson County ("Metro Council") in 1985. At issue in this appeal is a modification to the preliminary plan for the final phase of development on a 7.84-acre tract within Forest View Park. Originally, 212 multi-family units were approved to be constructed there, in the form of apartments. In 2016, the Planning Commission approved a modification to reduce the number of multi-family units from 212 to 96 units[2]; those plans also included a club house and recreation center. Pertinent to this appeal, in May 2019, the landowner and developer of the property, The Ridge at Antioch,[3] sought to revise the plan again to further reduce the number of dwellings. Instead of 96 apartment units contained in several multi-story buildings as originally planned, 56 townhomes would be built, contained in 12 buildings. This modified plan no longer included recreational facilities.

The Planning Commission's staff reviewed the proposed modifications, as did the Fire Marshall and Stormwater, Public Works, Water Services, and Traffic and Parking

---

[1] The zoning ordinances for Metropolitan Nashville and Davidson County are set forth in Title 17 of The Code of The Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro Code"), available at https://library.municode.com/tn/metro_government_of_nashville_and_davidson_county/ codes/code_of_ordinances. The Metro Code provides that a PUD district is "an alternative zoning process that allows for the development of land in a well-planned and coordinated manner, providing opportunities for more efficient utilization of land than would otherwise be permitted by the conventional zoning provisions of this title." Metro Code § 17.36.030. A PUD district "may permit a greater mixing of land uses not easily accomplished by the application of conventional zoning district boundaries, or a framework for coordinating the development of land with the provision of an adequate roadway system or essential utilities and services." *Id.* In exchange for that flexibility, the zoning regulations require "a high standard for the protection and preservation of environmentally sensitive lands, well-planned living, working and shopping environments, and an assurance of adequate and timely provision of essential utilities and streets" in the PUD district. *Id.*

[2] *See Metz v. Metro. Gov't of Nashville & Davidson Cty.*, No. M2017-00719-COA-R3-CV, 2018 WL 934649, at *4 (Tenn. Ct. App. Feb. 16, 2018).

[3] A special warranty deed in the record indicates that The Ridge at Antioch, Limited Partnership, conveyed the property to Ole South/Craighead Joint Venture on June 28, 2019. The Ridge at Antioch and Ole South/Craighead Joint Venture have filed a joint brief in this appeal, and we will refer to these parties collectively as "the developer."

Services departments. All recommended approval of the modifications, with certain conditions. The Planning Commission held a public hearing on this matter on June 13, 2019, at which Ms. Crawley spoke out in opposition to the proposed modifications to the plan. She cited concerns that the plan no longer included recreational facilities, namely a basketball court, track, and a gymnasium. She also stated that the soil in this portion of the development "has toxins" and that construction "could potentially expose not just the people who would live there, but also the surrounding community as well, to the toxins."[4] A representative of the developer stated that the modifications to the plan—from apartments to townhomes—were due to demand, and that if a recreational facility, such as a basketball court, was desired, it could be built. The Planning Commissioners then discussed the matter and confirmed with their staff that recreational facilities were not required, though the Chair noted "that it would be great to see some type of recreational space even though that isn't required." The Planning Commission unanimously passed Resolution No. RS2019-213, which conditionally approved the application to revise the plan and imposed conditions relating to signage, emergency vehicle access and water supply for fire protection, the provision of a corrected copy of the preliminary PUD plan, and the depiction of sidewalks and vertical obstructions on the final site plan.[5]

On July 29, 2019, Ms. Crawley filed a petition for writ of certiorari in the Davidson County Chancery Court against the Metropolitan Government of Nashville and Davidson County ("Metro").[6] In her petition, Ms. Crawley argued that by adopting Resolution No. RS2019-213, the Planning Commission "authorized illegal buildings to be constructed

---

[4] Ms. Crawley's concerns about the soil are based on a 2015 report in the administrative record. That report details a site investigation performed by Terracon Consultants, an environmental engineering firm, for the developer to determine if "waste materials are buried and whether [they] have impacted the property." The report states that Terracon personnel took soil samples "in areas where extensive dumping, primarily of metal cans that appeared to be old paint cans, were located." The soil samples were sent to a laboratory for testing, where polycyclic aromatic hydrocarbons, a group of semi-volatile organic compounds, were identified "at concentrations greater than the industrial screening level." To address this environmental concern, the developer engaged Terracon Consultants to create a site management plan. The plan, which is also included in the administrative record, provided that "[t]he area of known contaminated soil shall be removed and disposed of prior to grading or excavation operations at the site," which would require "a special waste permit" by the Division of Solid Waste Management ("DSWM"), and the preparation of "a waste profile" that would be "submitted to an authorized solid waste landfill." After those two steps were accomplished, Terracon Consultants would "mark the boundaries of the impacted material" and "remain on-site to oversee excavation operations and evaluate if additional excavation is necessary based on field indications of contamination." All contaminated soil would be transported to the approved landfill for disposal.

[5] We take judicial notice, pursuant to Rule 13(c) of the Tennessee Rules of Appellate Procedure, that the minutes of the June 13 meeting were approved at the Planning Commission's meeting on June 27, 2019. However, no copy of the approved and signed minutes appears in either volume of the administrative record.

[6] The petition was styled as a "Verified Petition for Declaratory Judgment/or Writ of Certiorari"; it demanded a jury hear the case. On the developer's motion, the court dismissed the declaratory judgment action and jury demand as being improperly joined to the petition for writ of certiorari.

within the Forest View Park PUD" and sought "relief to enforce the due process provisions" of the federal and state constitutions, the Tennessee Code, and the zoning provisions of the Metro Code. Her petition alleged that the land contained toxins and a well that needed to be addressed or "the health, safety and welfare of the Davidson County citizens could be compromised." The petition further alleged that the new plan "eliminated the required recreational facility requirement pursuant to Section 17.36.070 A.2.c.(2) of this Zoning Code." She also claimed that she "has been denied the opportunity to be heard about the enactment of Resolution No. RS2019-213 in accordance with the United States Constitution, Tennessee Constitution, Tennessee Code Annotated, and th[e] Zoning Code." She requested relief in many forms, including an injunction preventing the developer from applying for, and Metro from issuing, any building permits relating to the property.

After a hearing, the trial court concluded that the proposed revisions were "minor modifications" subject to approval by the Planning Commission and that the Planning Commission did not exceed its jurisdiction or render a decision that was arbitrary or capricious. It also concluded that no due process rights had been violated. Accordingly, the trial court affirmed the Planning Commission's decision and dismissed the petition for writ of certiorari with prejudice.

Ms. Crawley filed a motion to alter or amend the judgment, arguing that the court "mistakenly believed that the Planning Commission required [the developer] to follow the environmental recommendations" and that the court's order "conflicts with this Zoning Code." She also asserted that the "required safety component of this development was never considered by the Planning Commission." The court denied the motion.

Ms. Crawley timely appealed and states the following issue for our review: "Whether the trial court should have affirmed the June 13th decision [of the Planning Commission adopting Resolution No. RS2019-213], since the [Planning] Commission neglected (1) to consider the community's health and safety and (2) to require the recreation[al facilities]."

STANDARD OF REVIEW

"'Common law certiorari is available where the court reviews an administrative decision in which that agency is acting in a judicial or quasi-judicial capacity.'" *Father Ryan High Sch., Inc. v. City of Oak Hill*, 774 S.W.2d 184, 188 (Tenn. Ct. App. 1988) (quoting *Davison v. Carr,* 659 S.W.2d 361, 363 (Tenn. 1983)). Tennessee Code Annotated section 27-9-101 provides that "[a]nyone who may be aggrieved by any final order or judgment of any board or commission functioning under the laws of this state may have the order or judgment reviewed by the courts," and § 27-8-101 states:

The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial

- 4 -

functions has exceeded the jurisdiction conferred or is acting illegally, when, in the judgment of the court, there is no other plain, speedy, or adequate remedy.

The administrative decision of the Planning Commission is "presumed to be valid and a heavy burden of proof rests upon the shoulders of the party who challenges the action." *McCallen v. City of Memphis*, 786 S.W.2d 633, 641 (Tenn. 1990). Under the common law writ of certiorari, the reviewing court must examine whether the municipal agency acted illegally, arbitrarily, fraudulently, or in excess of its jurisdiction. *Id.* at 638. In doing so, the court determines "whether there is any material evidence that supports the action of the administrative agency." *Laidlaw Envtl. Servs. of Nashville, Inc. v. Metro. Bd. of Health for Nashville & Davidson Cty.*, 934 S.W.2d 40, 49 (Tenn. Ct. App. 1996) (citing *Lansden v. Tucker*, 204 Tenn. 388, 321 S.W.2d 795, 797 (Tenn. 1959)). Courts must not "reweigh the evidence" or "scrutinize the intrinsic correctness of the decision," but must independently review the record to "determine whether it contains 'such relevant evidence that a reasonable mind might accept as adequate to support a rational conclusion.'" *Lafferty v. City of Winchester*, 46 S.W.3d 752, 759 (Tenn. Ct. App. 2000) (quoting *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992)). A challenge to the evidentiary foundation for a local zoning decision presents a question of law, which we review *de novo* with no presumption of correctness. *Id.* This Court's review of the evidence on appeal "is no broader or more comprehensive" than the trial court's review. *Watts v. Civil Serv. Bd. for Columbia*, 606 S.W.2d 274, 277 (Tenn. 1980).

ANALYSIS

A. The Planning Commission's Authority to Approve the Modification

PUD districts must adhere to a rigorous approval process starting with the submission of a master development plan, which describes the development concept for all land area in the PUD district, to the Planning Commission. Metro Code § 17.40.120(A)(4). The plan is either approved, conditionally approved, or disapproved by the Planning Commission. *Id*. § 17.40.120(A)(4). The process culminates in the Metro Council's consideration of the master development plan for the PUD district; if approved, the Metro Council passes an amendment to the official zoning map establishing the PUD district. *Id*. §§ 17.40.120(A), 17.40.050, 17.40.060(A). Applications to subsequently modify a PUD district must be filed with and considered by the Planning Commission. *Id*. § 17.40.120(F). Certain modifications can be approved by only the Planning Commission, while others require additional approval by the Metro Council. *Id*. § 17.40.120(F), (G).

The parties all agree that Metro Code § 17.40.120(G) applies to this PUD district, and that provision states that a modification to a PUD approved under the authority of a previous zoning code must adhere to the following list of thirteen limitations to be eligible for approval solely by the Planning Commission:

a. In the judgment of the commission, the change does not alter the basic development concept of the PUD;

b. The boundary of the planned unit development overlay district is not expanded;

c. There is no change in general PUD classification (e.g. residential to any classification of commercial or industrial PUD; any change in general classification of a commercial PUD; or any change in general classification of an industrial PUD);

d. There is no deviation from special performance criteria, design standards, or other specific requirements made part of the enacting ordinance by the council;

e. There is no introduction of a new vehicular access point to an existing street, road or thoroughfare not previously designated for access;

f. There is no increase in the total number of residential dwelling units originally authorized by the enacting ordinance;

g. There is no change from a PUD approved exclusively for single-family units to another residential structure type;

h. The total floor area of a commercial or industrial classification of PUD shall not be increased more than ten percent beyond the total floor area last approved by the council;

i. If originally limited to office activities, the range of permitted uses in a commercial PUD shall not be expanded to broader classifications of retail, commercial or industrial activities, unless such activities are otherwise permitted by the underlying base zone district. The permitted uses within the planned unit development shall be those specifically authorized by the council through the adopted master development plan, or by the existing base zone district beneath the overlay, whichever is more permissive.

j. If originally limited to office, retail and other general commercial activities, the range of permitted uses in a commercial PUD shall not be expanded to include industrial activities, unless such activities are otherwise permitted by the underlying base zone district. The permitted uses within the planned unit development shall be those specifically authorized by the council through the adopted master development plan, or by the existing base zone district beneath the overlay, whichever is more permissive.

k. If originally limited to commercial activities, the range of permitted uses in a commercial PUD shall not be expanded to broader classifications of retail, commercial or industrial activities, unless such activities are otherwise permitted by the underlying base zone district. The permitted uses within the planned unit development shall be those specifically authorized by the council through the adopted master development plan,

or by the existing base zone district beneath the overlay, whichever is more permissive.

l. In the determination of the commission, the nature of the change will have no greater adverse impact on those environmentally sensitive features identified in Chapter 17.28 of this code than would have occurred had the development proceeded in conformance with the previous approval.

m. In the judgment of the commission, the planned unit development or portion thereof to be modified does not meet the criteria for inactivity of Section 17.40.120.H.4.a.

*Id*. § 17.40.120(G)(2). If the proposed modification does not meet the above criteria, the modification is considered an amendment to the previously approved PUD and must be referred back to the Metro Council for consideration. *Id*.

Though Ms. Crawley asserts that the Planning Commission illegally "amended the Forest View Park PUD when it approved a plan that did not provide: (1) recreational facilities and (2) protection from the toxins," she fails to demonstrate how the modifications to the master development plan to the PUD district (i.e., a reduction in the number of multi-family units to be built) fell into any of the above categories, requiring the Metro Council's approval of the modification. The record shows that there was no change to the boundaries of the PUD or a change to the development concept; neither did the developer seek to increase the number of residential dwelling units. The developer sought to reduce the number of multi-family units from 96 to 56 and to change their form from multi-story apartment buildings to townhomes in order to meet demand. From our review of the record, material evidence exists to support a conclusion that these modifications were minor within the meaning of Metro Code § 17.40.120(G)(2) and were of the type of change that did not require concurrence of the Metro Council. Only the approval of the Planning Commission was required for this revision to a portion of the PUD district.

Ms. Crawley argues that even if the modification is a minor one, the Planning Commission's decision ignored other provisions of the Metro Code that required recreational facilities to be built and that protected the community's health and safety by minimizing "toxic exposure." Her arguments are based on a strained interpretation of the zoning laws and, for the reasons stated below, we find them unpersuasive.

B. Recreational Facilities

Pertinent to her position that the Metro Code required recreational facilities be built in this final phase of development in Forest View Park, Ms. Crawley relies on section 17.36.070(A)(2)(c)(2) of the Metro Code, which states that "[a]t a minimum . . . [o]ne recreational facility shall be installed for developments containing between twenty-five and ninety-nine total residential units, plus an additional recreational facility for every

one hundred residential units in excess of the first ninety-nine units." Metro Code § 17.36.070(A)(2)(c)(2). However, that subsection must be read in context. Section 17.36.070(A)(1) permits clustering of single- and two-family residential lots at a greater density than otherwise permitted "in return for extraordinary protection of environmentally sensitive areas in a natural state." A developer who wishes to cluster lots in this way is required to "install and/or construct recreational facilities on a portion of the required undeveloped common open space," Metro Code § 17.36.070(A)(2)(a), and the subsection on which Ms. Crawley relies provides additional specifics for the number of recreational facilities to be installed in such a situation. So, section 17.36.070 requires recreational facilities to be constructed when a PUD clusters single- and two-family lots in an effort to protect environmentally sensitive areas. These provisions are inapplicable to the facts before us for two reasons.

First, the Metro Code establishes that the "environmentally sensitive areas" it seeks to protect "shall include undisturbed hillsides of twenty percent or greater slopes, nonmanipulated floodway and floodplain areas, problem soils, streams, creeks and major drains, designated wetlands, and areas containing protected Cedar Glade plant species." Metro Code § 17.36.050(A). The Metro Code discusses environmentally sensitive areas in depth in §§ 17.28.010 through -.060, where those areas are again identified as "sensitive hillsides," "special flood hazard[s]," "problem soils,"[7] and "Cedar Glade plant communities." Metro Code § 17.28.010; 17.28.020.  Ms. Crawley points to no evidence in the record, and we discern none, that would establish that Forest View Park contained any of those environmentally sensitive areas.

Second, recreational facilities are only required when a PUD clusters single- and two-family lots. Metro Code § 17.36.070(A). The Metro Code defines "single family" as "one residential dwelling unit per structure," while "two-family" means:

1. Two attached dwelling units that share the floor of a unit with the ceiling of another unit or a common wall from grade to eave at the front façade which continues for eighty percent of the common side or twenty feet, whichever is greater; or
2. Two detached dwelling units on a single lot which are separated by at least six feet.
3. In historic zoning overlays, the manner or existence of attachment shall be determined by the metro historic zoning commission.

---

[7] Metro Code section 17.28.050 identifies problem soils as "Bodine-Sulfura, Dellrose Cherty Silt Loam, Newark or Taft Silt loam soils." We note that the record contains a March 2016 Phase I Environmental Site Assessment Update prepared for the developer that recites, in a section titled "Soils," that "[t]he subject property is underlain primarily by the Talbott silt loam and Talbott-Rock outcrop complex. The Talbot[t] Series consists of well drained soils that formed from clayey residuum weathered from limestone."

Metro Code § 17.04.060. By contrast, "multi-family" is defined as "three or more dwelling units within a single structure." *Id*. The plan at issue in this case does not call for the clustering of single- and two-family lots. This portion of the PUD was originally approved for 212 multi-family units; that figure was reduced to 96 multi-family units in 2016, and the proposed modification at issue in this case "calls for a total of 56 multi-family units in the form of townhomes." There is simply no material evidence in the record that two-family dwellings (duplexes) were planned for this part of the development.

Accordingly, the provisions of Metro Code § 17.36.070, requiring the construction of recreational facilities when single- and two-family lots are clustered in an effort to protect environmentally sensitive areas, do not apply. Recreational facilities, while certainly a desirable amenity, are not mandated by the Metro Code under these circumstances. Even if recreational facilities were originally included in the developer's plan, their exclusion in the proposed plan does not constitute a modification that requires the council's approval pursuant to Metro Code § 17.40.120(G)(2).

C. Environmental Concerns

Ms. Crawley's remaining contentions on appeal focus on her concerns that toxins in the soil will be disturbed during development, resulting in exposure to Forest View Park residents and the surrounding community, which she believes violates Metro Code §§ 17.04.010, 17.04.020, 17.28.010, and 17.36.030.

Section 17.04.010 is a preamble that broadly states that the Metro Code establishes rules and procedures "to protect the public health, safety, . . . and general welfare of the present and future inhabitants of Metropolitan Nashville and Davidson County." This Court has held that "'[i]t is well settled in this state that the preamble of a statute or ordinance may be looked to in determining its construction but it is not a part of the controlling provisions of the ordinance.'" *Father Ryan High Sch.*, 774 S.W.2d at 190 (quoting *Harrell v. Hamblen Cty. Quarterly Court*, 526 S.W.2d 505, 508 (Tenn. Ct. App. 1975)). Section 17.04.020 addresses the applicability of the Metro Code to the development of all land within Metro's jurisdiction and sets forth that the zoning code's requirements "shall be considered as the minimum requirements for the promotion of the public health, safety, and general welfare." These two general provisions do not provide a means for relief for Ms. Crawley, as they set forth no specific standard against which the proposed development—and the harm she fears will result therefrom—could be measured. Sections 17.28.010 and 17.36.030 focus on standards for development for environmentally sensitive lands. As discussed previously in this opinion, there are four categories of "environmentally sensitive lands" specifically identified by the Metro Code, and there is no proof in the record that the land at issue in this case falls into any of the four categories. Her reliance on these particular provisions is misplaced, as they provide no avenue for the relief she seeks.

- 9 -

Moreover, there is no material proof in the record that these "toxins" would cause harm to the community. Ms. Crawley stated at the June 13 hearing that the construction "could potentially expose not just the people who would live there, but also the surrounding community as well, to the toxins." However, that statement does not "rise[] to the dignity of being material evidence on the issue" but instead "amount[s] to an expression of opinion on the ultimate issue, unsubstantiated by factual premises." *Sexton v. Anderson Cty.*, 587 S.W.2d 663, 666 (Tenn. Ct. App. 1979). "Speculations, expression of fears and considerations of an aesthetic or political nature do not form a basis to support a decision made by an administrative body charged with adjudicatory responsibility." *Id.* (citing *Harvey v. Rhea Cty. Beer Bd.*, 563 S.W.2d 790, 792 (Tenn. 1978); *Ewin v. Richardson*, 399 S.W.2d 318, 321 (Tenn. 1966)). Ms. Crawley presented no factual evidence to the Planning Commission as to how or why this development would expose the community to "toxins" or how it would interfere with public health or safety. *See Harvey*, 563 S.W.2d at 792. There is simply no material evidence in the record that the development would result in the community's exposure to hazardous substances in the soil.

Ms. Crawley cites to no provisions of the Metro Code that set forth the standards the Planning Commission is to employ to address the environmental concerns she raises or that specify the procedures to be followed when reviewing such a case. Our research has likewise revealed none, and we conclude that this particular type of environmental concern is outside the Planning Commission's designated responsibilities as set forth in the Metro Code.[8] Accordingly, there is no merit to Ms. Crawley's contentions that the Planning Commission "neglected" to consider the community's health and safety as it reviewed the proposed modification. Had the Planning Commission waded into this field, its decision would have been in excess of its jurisdiction.

In sum, the Metro Code sets forth the specific circumstances in which a modification requires the council's approval. None of those circumstances apply to the modification sought by the developer in this case, rendering the modification a minor one that required only the approval of the Planning Commission. On the record presented, there is material evidence that supports the action of the Planning Commission, and we discern no act that was illegal, arbitrary, fraudulent, or in excess of its jurisdiction. Accordingly, we concur in the judgment of the trial court.

---

[8] Metro and the developer contend, without citation to the record, that this project has been approved by the Tennessee Department of Environmental Conservation ("TDEC"). The site management plan identifies the Division of Solid Waste Management, which is a division of TDEC, as the proper authority to provide permits for the removal of the soils, but the record does not reveal the status of the project with respect to DSWM. At any rate, the site management plan, if followed, appears to resolve Ms. Crawley's concerns about the toxins in the soil by providing a means for the safe removal and disposal of the contaminated soil.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Virginia Crawley, for which execution may issue if necessary.


_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE