EDITH STROMATT,                          )
                                         )
        Plaintiff/Appellant,             )          Appeal No.
                                         )          01-A-01-9707-CH-00354
v.                                       )
                                         )
THE METROPOLITAN                         )          Davidson Chancery
EMPLOYEE BENEFIT BOARD                   )          No. 96-1250-I
OF THE METROPOLITAN                      )
GOVERNMENT OF NASHVILLE                  )          ┌─────────────────────┐
AND DAVIDSON COUNTY,                     )          │                     │
TENNESSEE,                               )          │      **FILED**      │
                                         )          │                     │
        Defendant/Appellee.              )          │ **September 2, 1998** │
                                         )          │                     │
                                                    │   **Cecil W. Crowson** │
                                                    │ **Appellate Court Clerk** │
                                                    └─────────────────────┘

COURT OF APPEALS OF TENNESSEE


APPEAL FROM THE CHANCERY COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE


THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR




CHARLES R. RAY
JEFFERY S. FRENSLEY
211 Third Avenue North
P. O. Box 198288
Nashville, Tennessee  37219-8288
        ATTORNEYS FOR PLAINTIFF/APPELLANT


JOHN L. KENNEDY
WM. MICHAEL SAFLEY
204 Metropolitan Courthouse
Nashville, Tennessee  37201
        ATTORNEYS FOR DEFENDANT/APPELLEE



AFFIRMED AND REMANDED


                                         WALTER W. BUSSART,
                                         SPECIAL JUDGE

# OPINION

The appellant in this action is Edith Stromatt, a former employee of the Metropolitan Government of Nashville, Tennessee. When Ms. Stromatt sought disability with the Metropolitan Employee Benefit Board ("the Benefit Board"), she was granted a medical disability pension; however, she was denied the in-line-of-duty pension (IOD) that she desired. Ms. Stromatt brought suit in chancery court claiming that the Benefit Board erred in its failure to grant her an IOD pension. She also claims that the Benefit Board denied her the constitutional right to be heard prior to its decision. The trial court agreed with the conclusions of the Benefit Board and dismissed Ms. Stromatt's appeal.

## I. FACTS AND PROCEDURAL HISTORY

At the time that she ceased work, Ms. Stromatt had been employed by the Metropolitan Government for 23 years. At all times material to this case, she held a position as the Executive Assistant to Bill Covington, the County Clerk of the Metropolitan Government. In September of 1995, following a lengthy medical leave of absence, Ms. Stromatt was advised that she would never be medically fit to return to work.

These proceedings began when, on May 12, 1995, Ms. Stromatt filed a claim with the Benefit Board seeking disability in the form of an IOD pension. The Metropolitan Government offers two types of pensions, an IOD pension and a medical disability pension. Though the two pensions are the same in amount, only the medical disability pension is treated as income for federal income tax purposes making it the less desirable of the two. In Ms. Stromatt's claim for an IOD pension, she alleged that she suffered from a condition of "stress/depression" which had begun at her work on March 28, 1995. Among Ms. Stromatt's allegations were that she was falsely accused of going through the desk of her boss, Mr. Covington, that she was often confronted with Mr. Covington's excessive in-office alcohol consumption as well as his illicit fraternizing with a female co-worker, and that she was ostracized by her co-

workers at the instruction of Mr. Covington.

At the September 11, 1995 Benefit Board meeting, a staff report on Ms. Stromatt shows that the Board considered information from Dr. Robert Cochran, Dr. Michael Bottari, and Dr. Jack Corban. The Board approved a medical disability pension for Ms. Stromatt and referred the matter to the IOD Committee to decide the issue of whether she could qualify for an IOD pension. As Mr. James Luther, the Benefit Board's Executive Secretary, notified Ms. Stromatt by letter, "[t]he issue to be dealt with at [IOD Committee] stage is not whether a disability exists as this has already been decided by the Board, but to determine whether the basis of the disability is job-related and arises out of [Ms. Stromatt's] employment."

On February 26, 1996, the IOD Committee held a meeting at which it considered the Executive Secretary's Staff Report to the IOD Committee ("the Staff Report"). In this report, Mr. Luther summarized information from many of Ms. Stromatt's co-workers, Mr. Covington, and the doctors who treated Ms. Stromatt. Plaintiff and her attorney were present at the February 26 meeting; however, the Committee denied their requests to make any legal argument or to present any evidence to the Committee. The Committee adopted the Executive Secretary's Staff Report which had the effect of denying Ms. Stromatt's application for an IOD disability pension. The Benefit Board then adopted the IOD Committee's report.

As stated above, Ms. Stromatt petitioned for a writ of certiorari in the chancery court pursuant to Tennessee Code Annotated section 27-8-101 and Tennessee Code Annotated section 27-9-101. The trial court found that Ms. Stromatt was given the opportunity to submit her own argument to the IOD Committee in writing and that she presented no other witnesses at the hearing. Further, the court found that her claim to a property right in the IOD disability pension before it is ever granted is without merit. It was the court's position that Ms. Stromatt would only have such a right if the requirements for the pension were met and the pension granted. Therefore, in this case, there was no due process violation. Finally, the court found that the Board's decision to deny Ms.

Stromatt an IOD disability pension was supported substantial and material evidence.

## II. STANDARD OF REVIEW

Review in this case is by common law writ of certiorari which is embodied in the Tennessee Code as follows:

> The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court, there is no other plain, speedy, or adequate remedy.

Tenn. Code Ann. § 27-8-101 (Supp. 1997). As the supreme court has summarized, "[r]eview under the common law writ is limited to whether 'the inferior board or tribunal (1) has exceeded its jurisdiction, or (2) has acted illegally, arbitrarily, or fraudulently.' " *McCallen v. City of Memphis*, 786 S.W.2d 633, 638 (Tenn. 1990) (quoting *Hoover Motor Exp. Co. v. Railroad and Pub. Util. Comm'n*, 261 S.W.2d 233, 238 (Tenn. 1953)); *see also Hoover, Inc. v. Metropolitan Bd. of Zoning Appeals*, 924 S.W.2d 900, 904 (Tenn. Ct. App. 1996). "An illegal, arbitrary, or fraudulent action could be any number of things. Examples include the following: 1) the failure 'to follow minimum standards of due process'; 2) 'the misrepresentation or misapplication of a legal standard'; 3) the making of a decision for 'ulterior motives'; or 4) the violation of a constitutional standard." *Hoover, Inc.*, 924 S.W.2d at 905 (quoting Ben H. Cantrell, *Review of Administrative Decisions by Writ of Certiorari in Tennessee*, 4 Mem.St.U.L.Rev. 19, 28-29 (1973)).

"The reviewing court is required to determine whether there is any material evidence that supports the action of the administrative agency." *Laidlaw Envtl. Servs. v. Metropolitan Bd. of Health*, 934 S.W.2d 40, 49 (Tenn. Ct. App. 1996) (citing *Lansden v. Tucker*, 321 S.W.2d 795 (Tenn. 1959)). While judicial review of the issue of whether there is any material evidence is limited to the record, "new evidence is admissible on the issue of whether the administrative body exceeded its jurisdiction or acted illegally, capriciously or arbitrarily." *Davison v. Carr*, 659 S.W.2d 361, 363 (Tenn. 1983) (citing *Watts*

*v. Civil Serv. Bd.*, 606 S.W.2d 274, 276-77 (Tenn.1980)).

### III.  PROCEDURAL DUE PROCESS

Ms. Stromatt has presented two issues on appeal.  First, she raises a constitutional challenge involving the Fourteenth Amendment's guarantee that property interests, once given, will not be taken away without the due process of law.  *See* U.S. Const. amend.  XIV, § 1.  Ms. Stromatt submits that she was deprived of procedural due process when she was denied the opportunity to be heard with respect to eligibility for an IOD disability pension.   It is Ms. Stromatt's position that her property right vested when the Benefit Board determined that she met the requirements for a disability pension at its September 11, 1995 meeting.

Evaluation of a due process claim entails a two-step analysis of which the first step is to determine whether the plaintiff was deprived of a protected interest.  *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).  Only after a court has decided that a plaintiff had a property or liberty interest does it address the second issue of what process was due the plaintiff.  As Ms. Stromatt's case hinges on the existence of a property interest, we turn to our supreme court's articulation of the legal principles of protected property interests:

> The Fourteenth Amendment's procedural protection of property safeguards the security of interests that a person has already acquired in specific benefits.  *Roth*, 408 U.S. at 576, 92 S.Ct. at 2708.  Property interests are not created by the federal constitution.  Instead, they are created and defined "by existing rules or understandings that stem from an independent source such as state law."  *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.  To be entitled to procedural due process protection, a property interest must be more than a "unilateral expectation" or an "abstract need or desire."  It must be a "legitimate claim of entitlement" to a specific benefit.  *Id.*  Indeed it is the purpose of the ancient institution of property to protect those expectations upon which people rely in their daily lives.  *Id.*

*Rowe v. Board of Educ.*, 938 S.W.2d 351, 354 (Tenn. 1996) (citing *Roth*, 408 U.S. at 569-70, 92 S.Ct. at 2705).

In the instant case, the "independent source" from which an alleged property interest must be derived is Chapter 3.28 of the Metropolitan Code which addresses disability pensions. In the section entitled "disability defined," the Code deems that an employee such as Ms. Stromatt is "'disabled' if he [or she] becomes permanently disabled as a result of a medically determinable bodily injury or disease or mental disorder so that during the continuation of his [or her] disability he [or she] is incapable of engaging in any business or occupation or to perform any work or compensation, gain or profit, so that the sum of his [or her] earnings while disabled and his [or her] gross disability pension does not exceed one hundred percent of his [or her] frozen earnings." Metro. Code § 3.28.010(B). For those employees who are disabled not in the line of duty, the code provides the following:

> A member who is covered for a disability pension, who has completed ten years of credited service and who becomes disabled as defined in Section 3.28.010, shall be eligible to receive a disability pension, subject to all applicable requirements of this chapter.

Metro. Code § 3.28.030. Regarding the employees who are disabled in the line of duty, Section 3.38.040 of the Metropolitan Code provides in pertinent part as follows:

> A member who is covered for a disability pension, who becomes disabled, as defined in Section 3.28.010, in the line of duty, shall be eligible to receive a disability pension, provided his disability is a result, directly or indirectly, of an act occurring or a thing done or a risk taken which, as determined in the discretion of the Board, was required of him in the performance of his duty as a metropolitan employee. . . .

In other words, for either type of pension, the Benefit Board must make a finding that the employee is disabled pursuant to the definition in Section 3.28.010(B). While such a finding, plus ten years of service, is all that is needed for a medical disability pension, the IOD pension requires an additional finding that the employee became disabled as "a result, directly or indirectly, or an act occurring or a thing done or a risk taken which, as determined in the discretion of the Board, was required of him in the performance of his duty as a metropolitan employee."

Under the language of the Metropolitan Code, an employee can have no "legitimate claim of entitlement" to an IOD pension until the Benefit Board has found both that the employee is disabled pursuant to Section 3.28.010(B) and that the employee became disabled in the line of duty as defined in Section 3.38.040. At the September 11, 1995 meeting, the Benefit Board found only that Ms. Stromatt qualified for a medical disability pension referring the issue of whether her injury was in the line of duty to the IOD Committee. Therefore, at that point in time, Ms. Stromatt had a property interest in a non-IOD pension that could not be deprived absent constitutionally adequate due process. However, she did not have a "legitimate claim of entitlement" to an IOD medical disability pension. Rather, her claim to an IOD pension following the September meeting could have been well characterized as a "unilateral expectation" or an "abstract need or desire." *See Rowe*, 938 S.W.2d at 354.

Our opinion is consistent with the holding of the unreported opinion from this court that a metropolitan employee's "pension vested at the time it was granted." *Wilburn P. Jones v. Metropolitan Gov't*, slip op. at 8 (M.D. Tenn. Ct.App. Nov. 30, 1979). In *Jones*, Justice Drowota, then of the Court of Appeals, reasoned that "[f]or a disability pension a finding by the appropriate board, in this case the Employee Benefit Board, that the applicant is indeed disabled and therefore entitled to benefits is the criterion for eligibility to receive payments." *Id.* slip op. at 8. Vested is defined as "[f]ixed; accrued; settled; absolute. Having the character or given the rights of absolute ownership; not contingent; not subject to be defeated by a condition precedent." Blacks Law Dictionary 1401 (5th ed. 1979). Before Ms. Stromatt's IOD pension was granted, it could not have been "vested" as it was contingent upon the IOD Committee of the Benefit Board making the requisite finding that Ms. Stromatt met the criterion for eligibility. Because Ms. Stromatt has failed to prove the existence of a constitutionally protected property interest in an IOD pension prior to such finding, the Benefit Board did not violate the Constitution in its refusal to hear Ms. Stromatt at this meeting.

IV.  SUFFICIENCY OF THE EVIDENCE

In her second and final issue, Ms. Stromatt asserts that the trial court erred in holding that the Benefit Board's determination to deny her an IOD disability pension was supported by substantial and material evidence. Initially, we point out that, though the lower court stated that the verdict must be supported by "**any** material evidence," it ultimately found that the Benefit Board's decision was supported by "**substantial** and material evidence." The substantial and material evidence standard is taken from Tennessee Code Annotated section 4-5-322 and does not apply to proceedings before local boards and commissions. As set out above, "[u]nder common law certiorari, the agency decision need only be supported by 'any' [material] evidence." *Laidlaw Envtl. Servs. v. Metropolitan Bd. of Health*, 934 S.W.2d 40, 49 (Tenn. Ct. App. 1996) (citing *Tennessee Cartage Co. v. Pharr*, 199 S.W.2d 119, 120-21 (Tenn. 1947)). In *Laidlaw*, the court noted that "[t]he difference between the two standards, though subtle, can be important when there is a dispute over the sufficiency of the evidence." *Id.* Therefore, we must conduct our review of the sufficiency of the evidence looking for "any material evidence."

To answer the "material evidence" question, we must determine the applicable law. As stated in the Executive Secretary's Staff Report, when considering IOD disability applications for stress or post-traumatic stress disorders, the Benefit Board uses analogous legal standards from workers' compensation law. For purposes of workers' compensation cases, Tennessee Code Annotated, section 50-6-102(a)(4) provides that "'[i]njury' and 'personal injury' means an injury by accident arising out of and in the course of employment which causes either disablement or death of the employee." While the courts have interpreted stress to be a compensable "accidental injury" under this law, there must "be a specific incident of stress which constitutes the accident." *Sexton v. Scott County*, 785 S.W.2d 814, 816 (Tenn. 1990).

In *Cabe v. Carbide Corp.*, 644 S.W.2d 397 (Tenn.1983), the court found that there had been an accident within the meaning of workers' compensation laws where a worker suffered a heart attack and died after a heated argument with a co-worker concerning the use of safety goggles. The court stated the law "that the term 'injury by accident' should not be limited to cases where some

physical or traumatic injury is shown; but 'some acute, sudden or unexpected emotional stress directly attributable to employment' and precipitating a heart attack would constitute a compensable accidental injury." *Id.* at 399 (citing *Allied Chemical Corp. v. Wells*, 578 S.W.2d 369, 372 (Tenn. 1979)). However, the court "limited the interpretation of that term, holding that 'worry, anxiety or emotional stress of a general nature' are not, in and of themselves, sufficient to establish an accident." *Id.* In *Jose v. Equifax*, 556 S.W.2d 82 (Tenn. 1977), the court upheld the employer's motion to dismiss a claim in which the employee alleged he was exposed to a tremendous amount of pressure and tension in his job which resulted in a severe psychiatric illness and later an habitual alcoholic problem. The court held that though "[a] liberal interpretation has been given to the statutory criterion of 'injury by accident,' . . . this still does not embrace every stress or strain of daily living or every undesirable experience encountered in carrying out the duties of a contract of employment." *Id.* at 84.

As in the foregoing cases, the Benefit Board has interpreted the Metropolitan Code to require that a "specific incident of stress" be shown in order to prove that an injury was in the line of duty when that injury involves stress. Under the worker's compensation body of law, the "specific incident" requirement is based upon the statutory language, "injury by accident." *See* Tenn. Code Ann. §50-6-102(a)(4) (1991). As stated above, in the case of disability pensions for metropolitan employees, the governing law is the Metropolitan Code which defines an IOD injury as one which is the "result, directly or indirectly, of an act occurring or a thing done or a risk taken which, as determined in the discretion of the Board, was required of him in the performance of his duty as a metropolitan employee." Metro. Code § 3.38.040. We find that the language, "an act occurring or a thing done or a risk taken," contemplates a specific incident much like the term "accident" does in the workers' compensation cases. As such, it is helpful to look to this well-developed worker's compensation law to guide us in the determination of the often difficult question of whether one's stress-related disability resulted from a specific incident.

Thus, in light of the foregoing, the question for the lower court as well as

for this court is whether the record contains material evidence supporting the Benefit Board's conclusion that Ms. Stromatt's disability did not result from "an act occurring or a thing done or a risk taken" in the performance of her duty as a metropolitan employee. The Benefit Board adopted the finding of the IOD Committee which was "that there are no facts that would indicate . . . that the application should be granted as an in-line-of-duty injury. . . . [T]he facts submitted by Edith Stromatt would be categorized as nothing more than the stress or strain of daily living encountered in carrying out the duties of employment and that this pension should, in fact, remain a medical disability pension and not be converted to an in-line-of-duty disability pension."

In the Executive Secretary's Staff Report to the IOD Committee, the Executive Secretary, Mr. Luther states that he reviewed the allegations submitted by Ms. Stromatt and then interviewed Mr. Covington as well as almost every other individual named in Ms. Stromatt's statement. He summarized all the information by dividing it into nine general categories of allegations. The first and second of these alleged incidents involved Ms. Stromatt's being accused of going through Mr. Covington's desk and then new locks being placed on Mr. Covington's office doors "in an effort to deliberately intimidate and cause additional emotional stress." When interviewed about this, Mr. Covington stated that after the janitor advised him that Ms. Stromatt was going through his desk, he did approach her about this. When confronted, Ms. Stromatt said that she had been looking for a pencil. Two other employees, Ms. Abbott and Ms. Norman, stated that they never heard Mr. Covington make such accusations and that this must have occurred in a private conversation. As for changing the locks, Mr. Covington confirmed that new locks were put on his door to secure his office at night and that there had been talk of this for some time. Ms. Abbott testified similarly that the old locks had not worked and that new locks had been requested for a while.

Thirdly, Ms. Stromatt claimed that her co-workers were instructed not to talk to her. Mr. Covington disputed this saying that he had, in fact, encouraged other employees to talk to Ms. Stromatt when she seemed depressed. Six co-workers were interviewed and they gave consistent testimony that Mr. Covington

had never asked them not to talk to Ms. Stromatt. Indeed, they all stated, as Mr. Covington had, that he had encouraged them to talk to her. One employee even characterized Mr. Covington's request as "begging and pleading" to get along with Ms. Stromatt. The employees said that they felt free to talk to Ms. Stromatt and did talk to her about her family issues. One employee stated that, for a period of about two and a half months, Ms. Stromatt would not talk to him so he asked Mr. Covington to speak with her in an attempt to restore communication. Ms. Stromatt had specifically mentioned that a Mr. Dozier was asked not to talk to her; however, when interviewed, Mr. Dozier said that Mr. Covington had never discouraged him from talking to Ms. Stromatt.

The fourth category involves Ms. Stromatt's intimations that Mr. Covington had helped individuals who had embezzled funds from the office. She stated that "the thieves in the office were treated with more respect than" she was. When interviewed, Mr. Covington stated that there had been three incidents of embezzlement over the past eight and a half years. In two of these, the matters were turned over to the district attorney. The other resulted in the perpetrator being imprisoned, and when Mr. Covington testified in that case, he recommended that the individual not be placed on probation.

Next, Ms. Stromatt made several references to Mr. Covington's consumption of alcohol in the office after hours as well as to her concern that he was going to be arrested for a DUI and thereby expose the office to negative publicity. Mr. Covington stated that these statements were absolutely not true and that the conversations alleged by Ms. Stromatt did not occur. Two employees, Ms. Abbott and Ms. Norman, stated that there had never been any evidence that Mr. Covington had been drinking in the office. Ms. Stromatt claimed there had been conversations between her and the janitor, Mr. Patton, in which she asked the janitor to protect Mr. Covington by not discussing the beer cans with anyone else. However, Mr. Patton denied that this conversation took place and said that the only time he noticed any beer cans in the office was after a Christmas Party during which three friends of Mr. Covington brought beer to the office.

The sixth category, as summarized by the Executive Secretary's Staff Report, involves Mr. Covington's socializing with an unnamed female. Both Mr. Covington and Ms. Abbott and Ms. Norman were asked about this and all three indicated that nothing of this nature had occurred. Likewise, two other employees, Mr. Brasser and Mr. McKinnon, denied that there was any truth to the seventh class of allegations, that Mr. Covington had directed metropolitan employees to purchase beer and snacks for his personal consumption. Mr. Brasser said that he had been employed in that office for eight years and had never seen Mr. Covington take a drink.

The eighth classification involves Ms. Stromatt's references to Mr. Covington's assigning busy work to the employees. Again, Mr. Covington and another employee, Mr. McClure, denied such allegations. Mr. McClure asserted that "busy work" was never generated for the employees. Though he had given work to Ms. Stromatt to do, he did so on his own and not at the insistence of Mr. Covington. He was emphatic that the only reason he did so was because Ms. Stromatt had requested that she be allowed to help if there was a need. Finally, Ms. Stromatt made a reference to Mr. Covington's failure to set the night alarm. When interviewed, Mr. Covington stated that this area had always been his responsibility and not Ms. Stromatt's. He stated that there had been a few problems with the alarm over the years but that he had dealt with the alarm company when such problems arose.

The Staff Report concluded its section on the non-medical facts with some general comments. The employees who were interviewed expressed their opinion that Mr. Covington had treated Ms. Stromatt well and exhibited much tolerance for her situation. It was the conclusion of the Executive Secretary in the Staff Report that, "[w]hile there may have been a perception by Edith Stromatt that she was being singled out and treated differently, the overwhelming evidence from other employees is that, from a factual standpoint, this was not happening."

The Staff Report also included a section on the medical facts in which the Executive Secretary summarized the information from the doctors who had

treated Ms. Stromatt. The summaries indicate that Ms. Stromatt's medical conditions were diagnosed as having originated with stress and anxiety that she was placed under at work. In a separate report received by the Benefit Board from Dr. Bottari, a clinical psychologist, Ms. Stromatt was diagnosed with an adjustment disorder which had the possibility of developing into more prolonged depression. He made reference to the fact that there were many stresses at Ms. Stromatt's job including conflict with her boss and upsetting job interactions and policies. He reported that Ms. Stromatt was particularly fearful of retribution from Mr. Covington. In a letter dated August 4, 1995, Ms. Stromatt's physician, Dr. Cochran, informed the Benefit Board that she was suffering from depression and connective tissue disorder dating the illness to January 26, 1995. This letter did not refer specifically to work anxiety; however, some physician's notes from Dr. Cochran reflect that Ms. Stromatt was under stress at work on May 18, 1993. Again on March 22, 1995, Dr. Cochran made the following notation: "Many stresses at her job. She's coming apart. She's out of control and this lady's been in control most of her life." Dr. Cochran's records failed to recount any specific incidents giving rise to the stress. Finally, an October 17, 1995 letter from Dr. Jacobi mentioned only "an exceptional amount of situational stress with resultant anxiety and depression."

Ms. Stromatt submits that there is not any material evidence to support a finding that there was no specific incident of stress which caused the disability. We respectfully disagree. While Ms. Stromatt has certainly alleged specific incidents of stress, the fact is that all such allegations were contradicted quite consistently by her superior at work as well as her co-workers. We acknowledge that one of the doctors who treated Ms. Stromatt referred to her experiencing conflict with her boss and to her being upset by certain work policies. However, even if these rise to the level of "specific incidents of stress," this information was based on Ms. Stromatt's report of the facts to the doctor, facts which are in dispute. To reiterate, the question for this court is not whether there is any record evidence to support a finding of a specific incident of stress. Rather, it is whether there is any material evidence to support a converse finding. We conclude that there is material evidence to support the Benefit Board's determination that "the facts submitted by Edith Stromatt would be categorized

as nothing more than the stress of daily living encountered in carrying out the duties of employment."

## V.  CONCLUSION

We affirm the trial court and remand this case to the trial court.  There can be no property interest in an IOD pension before it is granted.  Therefore, the Benefit Board did not violate the Fourteenth Amendment's guarantee of procedural due process when it denied Ms. Stromatt a chance to be heard on the matter of her qualification for an IOD pension.  Finally, we find that there was material evidence to support the Benefit Board's determination that it must deny Ms. Stromatt an IOD disability pension based on the record before it.

The cost of this appeal should be taxed to Edith Stromatt.

_____

WALTER W. BUSSART,
SPECIAL JUDGE

CONCUR:

_____

BEN H. CANTRELL, JUDGE

_____

WILLIAM C. KOCH, JR., JUDGE