IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 4, 2019 Session

## PRECISION HOMES, INC. v. THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

Appeal from the Chancery Court for Davidson County
No. 17-467-I     Claudia Bonnyman, Chancellor

_____

### No. M2018-01322-COA-R3-CV

_____

The owner of three lots located in a water quality buffer zone along the Cumberland River filed a request for a variance to allow the owner to build a small house on each lot. The Metropolitan Stormwater Management Committee denied the request for a variance, and the chancery court affirmed the committee's denial. We affirm the trial court's judgment in all respects.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

Shawn Ray Henry, Nashville, Tennessee, for the appellant, Precision Homes, Inc.

Lora Barkenbus Fox and Catherine Jane Pham, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

In 1999, the Metropolitan Government of Nashville and Davidson County ("Metro") instituted stormwater regulations that created water quality buffers.[1] Precision Homes, Inc. ("Precision") owns three vacant lots on Miami Avenue along the Cumberland River and entirely within the Zone 1 water quality buffer. This water quality buffer includes the floodway for the Cumberland River plus an additional 50 feet. Metro

_____

[1] "Buffer" is defined as "[a] vegetated area, including trees, shrubs and herbaceous vegetation, which exists or is established to protect community water. Alteration of this natural area is strictly limited." Metro Stormwater Mgmt. Regs. App. B, Definitions.

Stormwater Mgmt. ("SWM") Regs. § 6.9.2. Zone 1 is a "'no disturb zone,' where the vegetation cannot be disturbed, removed or replanted unless a buffer restoration plan has been approved" by the Metro Department of Water and Sewerage Services. *Id.* Construction is not permitted in Zone 1 without a variance. SWM Regs. § 6.9.3. The three lots, purchased by Precision in 2004, were inundated during the May 2010 flood.

On November 2, 2016, Precision submitted a request for a variance from the stormwater regulations to the Stormwater Management Committee ("SWMC" or "the Committee") so that it could build an 800-square-foot one-bedroom house on each lot. In its statement of hardship, Precision stated: "This lot is 100% within the floodway or the zone 1 Stream Buffer and therefore the lot cannot be utilized without the requested variance."

The SWMC first met about Precision's variance request at a public hearing on December 1, 2016. The Committee voted to defer the matter to allow SWMC staff to evaluate possible options for purchase of the properties or a land swap. At the SWMC's next meeting, on January 5, 2017, the staff reported that there was no money available to purchase the lots and no possibility of a land swap. The Committee considered a motion to approve Precision's variance request, and the motion failed by a vote of four to two. On March 2, 2017, the SWMC considered a request filed by Precision that the Committee rehear its variance case. The SWMC voted to rehear the case. At its April 6, 2017 meeting, the SWMC reheard the variance request, and a motion to approve the variance failed by a vote of three to three.

Precision filed a petition for writ of certiorari in the chancery court and, in an order entered on June 27, 2018, the court affirmed the decision of the SWMC. The court found that the "Committee's decision was based on substantial and material evidence and was not arbitrary and capricious."

On appeal, Precision presents a number of arguments to support its position that the trial court erred in affirming the decision of the SWMC, including challenges to the reasoning applied by various board members. Metro asserts that the trial court correctly determined that there was substantial and material evidence to support the Committee's decision to deny the variance. Precision also argues that it is entitled to its attorney fees under the Equal Access to Justice Act.

STANDARD OF REVIEW

As this court has stated, "the only issue raised by a writ of common law certiorari is whether the Board exceeded its jurisdiction or acted illegally, arbitrarily, or fraudulently." *Hoover, Inc. v. Metro Bd. of Zoning Appeals*, 924 S.W.2d 900, 904 (Tenn. Ct. App. 1996). Review by a court under the common law writ of certiorari is limited to a determination of whether the municipal agency acted illegally, arbitrarily, fraudulently,

or in excess of its jurisdiction. *McCallen v. City of Memphis*, 786 S.W.2d 633, 638 (Tenn. 1990). In doing so, the court determines "whether there is any material evidence that supports the action of the administrative agency." *Laidlaw Envtl. Servs. of Nashville, Inc. v. Metro. Bd. of Health for Nashville & Davidson Cnty.*, 934 S.W.2d 40, 49 (Tenn. Ct. App. 1996). Under the common law writ, "courts may not (1) inquire into the intrinsic correctness of the lower tribunal's decision, (2) reweigh the evidence, or (3) substitute their judgment for that of the lower tribunal." *State ex rel. Moore & Assocs., Inc. v. West*, 246 S.W.3d 569, 574 (Tenn. Ct. App. 2005) (citations omitted).

The issue of "[w]hether or not there is any material evidence to support the action of the agency is a question of law to be decided by the reviewing court upon an examination of the evidence introduced before the agency." *Massey v. Shelby Cnty. Ret. Bd.*, 813 S.W.2d 462, 465 (Tenn. Ct. App. 1991) (citing *Hoover Motor Express Co. v. R.R. & Pub. Utils. Comm'n*, 261 S.W.2d 233, 239 (Tenn. 1953)). With respect to conclusions of fact, Judge Cantrell described the proper analysis for a reviewing court: "'The function of the reviewing court is limited to asking whether there was in the record before the fact-finding body *any* evidence of a material or substantial nature from which that body *could* have, *by reasoning from that evidence*, arrived at the conclusion of fact which is being reviewed.'" *Id.* (quoting B. Cantrell, *Review of Administrative Decisions by Writ of Certiorari in Tennessee*, 4 MEM. ST. U. L. REV. 19, 29-30 (1973)).

ANALYSIS

I. <u>Legal standards for variance request under Metro stormwater regulations.</u>

We begin with a discussion of the legal standards applicable to the SWMC's decision regarding Precision's variance request. Metro's stormwater management regulations provide the following standards for granting a variance:

a. Variances shall only be issued upon a determination that the variance is the minimum necessary, considering the flood hazard, to afford relief; and in the instance of a historical building, a determination that the variance is the minimum necessary so as not to destroy the historic character and design of the building.

b. Variances shall only be issued upon (i) a showing of good and sufficient cause, (ii) a determination that failure to grant the variance would result in exceptional hardship, and (iii) a determination that the granting of a variance will not result in increased flood heights, additional threats to public safety or extraordinary public expense; create nuisance; cause fraud on or victimization of the public; or conflict with existing local laws or ordinances.

- 3 -

SWM Reg. § F1.1.2(4). The regulations further state that the SWMC "shall consider all technical evaluations, all relevant factors, all standards specified in others sections of these regulations," and the following list of considerations:

a.  The danger that materials may be swept by floodwaters or streams onto other lands to the injury of others.

b.  The danger to life and property due to flooding or erosion damage.

c.  The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner.

d.  The importance of the services provided by the proposed facility to the community.

e.  The necessity of the facility to a waterfront location, in the case of a functionally dependent facility.

f.  The availability of alternative locations, not subject to flooding or erosion damage, for the proposed use.

g.  The compatibility of the proposed use with existing and anticipated development.

h.  The relationship of the proposed use to the comprehensive plan and master drainage plans for that area.

i.  The safety of access to the property in times of flood for ordinary and emergency vehicles.

j.  The expected heights, velocity, duration, rate of rise, and sediment transport of the floodwaters and the effects of wave action, if applicable, expected at the site.

k.  The costs of providing governmental services during and after flood conditions including maintenance and repair of public utilities and facilities such as sewer, gas, electrical, and water systems, and streets and bridges.

l.  The following evaluation criteria will apply to appeals involving modification of the buffer.

i.  Modifications to the buffer area shall be the minimum necessary to achieve a reasonable buildable area, as decided by the Committee. Other requirements for building in the floodway shall still apply.

ii.  Where possible, an area equal to the encroached area or equivalent stormwater management practices shall be established elsewhere on the lot or parcel in a way to maximize, or provide equivalent, storm water quality enhancement and protection.

iii.  Variances for reducing the no-disturbance buffer require a written recommendation, positive or negative, from the Greenways Commission.

iv.  Redevelopment, as defined in Appendix B of this volume, within intensely developed areas may be exempt from all or a portion of the

requirements of this subsection, provided feasible alternatives or BMPs[2] to benefit storm water quality are applied.

SWM Reg. § F1.1.2(1).

The regulations do not define "good and sufficient cause" or "exceptional hardship," the legal standards upon which the variance decision is to be based. Precision and Metro offer differing interpretations of these terms. We begin by noting that, in its variance request, Precision asked for "permission to construct a single family residence in the Zone 1 floodway buffer for the Cumberland River." Thus, Precision asked for a modification in its use of the buffer, not for a modification in the size of the buffer area.

In discussing the relevant legal standards, Precision emphasizes two provisions in the SWM regulations applicable to modifications to the buffer area. Section 6.9.3 of the SWM regulations states, in pertinent part: "When the application of the buffer area would result in the extreme loss of buildable area, modifications to the width of the buffer area may be allowed through the Stormwater Management Committee appeals process." We do not consider this section applicable because Precision has not requested a modification "to the width of the buffer area." Precision also cites section F1.1.2(1)(l)(ii) of the SWM regulations, one of the criteria found under subsection (l) of the variance considerations (set out above), which concerns "modification of the buffer." This criterion provides that, "[w]here possible, an area equal to the encroached area or equivalent stormwater management practices shall be established elsewhere on the lot or parcel in a way to maximize, or provide equivalent, storm water quality enhancement and protection." We, likewise, do not consider this provision applicable to the present case because Precision's variance request does not involve a modification to the water quality buffer area.

Next, Precision argues that this is a "situation where reasonable use of the land cannot be made with strict adherence to the zoning regulations." Because several of the cases cited by Precision in support of this argument involved the rezoning of property rather than requests for variances[3] from the zoning ordinance, we do not consider them instructive here. *See Campbell v. Nance*, 555 S.W.2d 407 (Tenn. Ct. App. 1976); *Bayside Warehouse Co. v. City of Memphis*, 470 S.W.2d 375 (Tenn. Ct. App. 1971). In *Metropolitan Historical Commission v. Colony Associates Joint Venture*, 1988 WL 109234, at *6 (Tenn. Ct. App. Oct. 19, 1988), another case cited by Precision, the board of zoning appeals granted a variance to allow for the construction of a 21-story

---

[2] "BMPs" are Best Management Practices. Metro Stormwater Mgmt. Regs. App. B., Acronyms.

[3] As this court has explained, "[a] variance is an authorization to construct or maintain a building or structure or to establish or maintain a use of land that is otherwise prohibited by the zoning ordinance." *Hunter v. Metro. Bd. of Zoning Appeals*, No. M2002-00752-COA-R3-CV, 2004 WL 315060, at *6 (Tenn. Ct. App. Feb. 17, 2004).

commercial building in downtown Nashville. The Metropolitan Historical Commission filed a petition for writ of certiorari, and the trial court affirmed the decision of the board of zoning appeals. *Colony*, 1988 WL 109234, at *7. On appeal, this court determined that, read together, state law and the zoning ordinance required proof "that a particular hardship (as distinguished from a mere inconvenience or diminution of financial return) is imposed upon the owner by (1) size (2) shape or (3) topographical conditions of the property." *Id.* at *9. The owner asserted only that the architect's design did not conform to the zoning law and that "a change in the designed configuration would be required to comply with the law." *Id.* The only hardship identified by the board of zoning appeals was "frontage on four streets." *Id.* at *10. This court concluded that "[t]he inability to pursue one of a great number of alternates is not a '"hardship."'" *Id.* Finding that the board's decision was not supported "by any evidence of any ground of variance included in the statute or local code," the court reversed the trial court's decision.[4] *Id.* at *12. The *Colony* case does not provide support for Precision's theory because it did not involve a property owner who was unable to make use of its property without a variance.

In *McClurkan v. Board of Zoning Appeals for Metropolitan Government of Nashville & Davidson County*, 565 S.W.2d 495, 496 (Tenn. Ct. App. 1977), owner #1 sold her property to owner #2. Owner #1 had applied for and been granted a permit to continue using the property as a four-family apartment dwelling after it was zoned for one- and two-family dwellings. *McClurkan*, 565 S.W.2d at 496. The permit stated that, when owner #1 ceased to live there, the property would revert to a "lawful use." *Id.* After buying the property, owner #2 applied for a variance, and the board of zoning appeals denied the application. *Id.* He filed a writ of certiorari, and the trial court affirmed the board's decision. *Id.* This court cited the state statute authorizing municipal boards of zoning appeals to grant variances where, due to the unusual characteristics of the property at the time of the enactment of the zoning regulations, or due to "exceptional topographic conditions or other extraordinary and exceptional situation or condition of such piece of property," the regulations would "impose 'peculiar and exceptional practical difficulties . . . or undue hardship upon the owner . . . .'" *Id.* at 497 (citing prior version of Tenn. Code Ann. § 13-7-207(3)). The court went on to state that both the state statute and the local zoning ordinance "clearly contemplate that a variance is not a 'personal license given to a landowner.'" *Id.* Rather, "it is the peculiar circumstances of the land that must be the primary consideration, rather than any hardship personal to or created by an owner of it." *Id.* Applying these principles to the facts of that case, the court determined that owner #2 was not entitled to a variance based on a hardship created by an owner of the property and that "the case for a variance here is made even weaker by a lack of any evidence of hardship other than pecuniary loss, which has been held insufficient by itself to justify a variance." *Id.* (citing *Houston v. Memphis & Shelby Cnty. Bd. of Adjustment*, 488 S.W.2d 387, 389 (Tenn. Ct. App. 1972)); *see also*

---

[4] We decline to rely upon the general zoning principles and cases from other states cited in the *Colony* opinion to the extent they were unnecessary to the resolution of the dispute before the court.

*Hillsboro-W. End Neighborhood Ass'n, Inc. v. Metro. Bd. of Zoning Appeals*, No. 01A01-9406-CH-00282, 1995 WL 79224, at *2-3 (Tenn. Ct. App. Feb. 24, 1995) (finding no material evidence to support board's grant of variance "[b]ecause there are no facts establishing a hardship to the defendant created by the peculiar characteristics of the land").

We do not have any cases interpreting Metro's SWM regulations. The caselaw, on variances in other zoning contexts discussed above provides some persuasive authority. Those cases considered the governing statutes and ordinances and concluded that the board's granting of a variance must be based upon hardship related primarily to the circumstances of the land rather than to the personal circumstances of the property owner.

Metro argues that the SWM regulations "align with the standards contained in FEMA's[5] regulations on the National Flood Insurance Program, codified at 44 C.F.R. § 60.6." We agree with Precision that the FEMA variance provisions cited by Metro do not apply to the present case.[6] The variance provision (44 C.F.R. § 60.6(a)(3)) in these federal regulations, however, is essentially the same as the variance provision (§ F1.1.2(4)(b)) in Metro's stormwater regulations. Both provisions require a showing of "good and sufficient cause" and a determination that failure to grant the variance will result in "exceptional hardship" to the applicant. In this circumstance, where the parties have cited no other source to define these terms, we will consider the authority offered by Metro as to FEMA's interpretation of the terms.

According to FEMA, a variance request based on "good and sufficient cause" "deals solely with the unique site-specific physical characteristics of the property, subdivision lot, or land parcel in question." *Variances and the National Flood Insurance Program*, FLOODPLAIN MGMT. BULLETIN § 3.3.3 (FEMA July 2014). FEMA further states:

> A "good and sufficient" cause for a variance occurs when a parcel of land possesses physical characteristics so unusual that complying with NFIP[7] regulations in a local ordinance would create an exceptional hardship related to the property, the surrounding property owners, or the community

---

[5] "FEMA" stands for "Federal Emergency Management Agency."

[6] The federal regulations provide, in pertinent part, that "[v]ariances may be issued by a community for new construction and substantial improvements to be erected on a lot of one-half acre or less in size contiguous to and surrounded by lots with existing structures constructed below the base flood level . . . ." 44 C.F.R. § 60.6(a)(2). Precision's project is not below the base flood level and does not fit within this description. In fact, federal regulations do not require water quality buffers.

[7] "NFIP" stands for "National Flood Insurance Program." 44 C.F.R. § 206.251(d).

in general.  In addition, the unusual physical characteristics must be unique to that property and not be shared by adjacent parcels or be typical of other lots in the community.

*Id.*  FEMA explains that a determination of "good and sufficient cause" should never be based upon "the personal difficulties of the owner or inhabitants" and that "the financial hardship of the property owner is never a 'good and sufficient' cause for granting a variance." *Id.*

As to the requirement that denial of the variance would result in "exceptional hardship," FEMA offers the following interpretation:

The hardship that would result from failure to grant a requested variance must be exceptional, unusual, and specific *to the property involved*, not the personal circumstances of the applicant.  When determining whether an applicant has established an exceptional hardship sufficient to justify a variance, the local variance appeal board or other governing body must weigh the applicant's hardship against the community-wide flood damage prevention requirements.

. . . This applies even if the alternative means of construction are more expensive or complicated than building the structure with a variance, or if they require the property owner to use the parcel differently than originally intended or build the home elsewhere.

*Id.* at § 3.3.4.

Overall, the FEMA guidance is similar to the Tennessee caselaw in that the emphasis is on the peculiar characteristics of the property itself and not upon the personal circumstances of the property owner.

II.  Application of standards to Precision's variance request.

As a reviewing court, we must determine "whether there is any material evidence that supports the action of the administrative agency." *Laidlaw,* 934 S.W.2d at 49.  The threshold standard that a variance must meet is the following:

Variances shall only be issued upon (i) a showing of good and sufficient cause, (ii) a determination that failure to grant the variance would result in exceptional hardship, and (iii) a determination that the granting of a variance will not result in increased flood heights, additional threats to public safety or extraordinary public expense; create nuisance; cause fraud

on or victimization of the public; or conflict with existing local laws or ordinances.

SWM Reg. § F1.1.2(4)(b). Precision appealed an adverse decision of the Department of Water Services "that no construction can occur on this lot without approval of a variance from the Stormwater [Management] Committee." Precision's statement of hardship provides in full: "This lot is 100% within the floodway or the zone 1 Stream Buffer and therefore the lot cannot be utilized without the required variance." Similarly, at the April 6, 2017 hearing before the Committee, Precision stated: "So the exceptional hardship that would result if this variance is not granted is the inability to construct a home, period."

Does the fact that no construction can occur on these lots without a variance constitute exceptional hardship and/or good and sufficient cause? Under the standards discussed above, we conclude that there is nothing unusual or exceptional about Precision's property; rather, the lots are located in Zone 1, where construction is not permitted, and Precision did not submit evidence sufficient to overcome the "extreme hardship" threshold necessary to justify a variance from the requirements of the Zone 1 restrictions.

As set forth above, there are also numerous "considerations" appropriate for the Committee to take into account in making its determination. *See* SWM Reg. § F1.1.2(1). A variance shall not be issued, however, without a determination that exceptional hardship would otherwise result.

We will proceed to examine Precision's objections to the individual votes cast in favor of the Committee's decision to deny the variance.

A. Vote of Committee Member Debra Grimes.

Precision makes two arguments regarding the vote of Committee Member Grimes: (1) that her vote was "arbitrary and illegal" because it was based on criteria not authorized by the ordinance and because she voted to deny the variance despite concluding that Precision met the legal requirements; and (2) that her reasoning was not supported by material evidence.

As to the first argument, Precision cites the legal proposition that "a board member can not vote to deny an application when the board member believes the applicant has met the necessary zoning requirements. " *Hoover*, 924 S.W.2d at 905. In *Hoover*, a case involving a conditional use permit, the court stated that, if a board member based his or her "decision to deny the permit on something other than whether [the applicant] had met the required conditions," that "decision is arbitrary under the laws of Tennessee." *Id.* at 905-06. In the present case, Precision cites the following testimony as a basis for

- 9 -

asserting that Ms. Grimes reached the conclusion that Precision met the legal requirements for a variance yet voted against granting it a variance:

> They've met the criteria as outlined by their attorney, and met the right— the ordinances. So although I think it's a great goal, I don't know how we can be the one to stand in—to hold that mind, I guess.

According to Precision, "it is illegal for her to conclude that Precision Homes met the ordinance requirements for a water quality variance and then deny the application for a reason other than the ordinance criteria."

Although the isolated quotation relied upon by Precision seems to lend support to its argument, it is important to view the entirety of Ms. Grimes's pertinent testimony:

> MS. DEBRA GRIMES: I've been kind of waffling back and forth, really trying to decide which way I would vote on this. And—because I think that the thought that Metro is moving that direction to try to recapture the riverfront makes a lot of sense. And I would love to see that happen.
> But we can't hold that flag when Planning approved it, because that's a Metro committee as well. And if Metro is unwilling to buy it as the client said, you know, that really puts their—what they're saying they want into play.
> And so for us to try to hold up the flag and fight the battle for them when they're not—not everybody is fighting the same battle—I guess it just makes it hard for me to say that would be a reason to deny this, which they certainly are doing the mitigation that's needed. They've met the criteria as outlined by their attorney, and met the right—the ordinances. So although I think it's a great goal, I don't know how we can be the one to stand in—to hold that mind, I guess.
> CHAIRPERSON WAGNER: All right. Thank you, Ms. Grimes.
> MS. PAULA KEE [Metro Water Services]: I guess I wanted to provide a little clarification. I think you mentioned Planning approved it. That—they got no variance from the Board of Zoning Appeals for front setback.
> But Planning's comment was: "Planning will not have further comments for these cases. The previous comments from Stormwater provide an effective premise for not granting a variance for any of these lots along Miami."
> MS. DEBRA GRIMES: That's it. Thank you.

In context, Ms. Grimes's statements indicate that she had not yet decided how she was going to vote. At the time of the above statement, she thought that Precision had met the criteria of the ordinance—according to its attorney—but she was still gathering

- 10 -

information and had not yet made up her mind. Although the Committee discussion after Ms. Grimes's comments did not pertain to the points she raised, there was additional discussion about adding a condition and Ms. Grimes had time to consider her vote; when it was time to vote, she voted against approving the variance. We reject Precision's assertion that Ms. Grimes's vote was arbitrary and illegal.

Precision's argument that Ms. Grimes's vote was not supported by material evidence is based upon the same theory as its first argument, namely that Ms. Grimes found that Precision met all the requirements for a variance. Because we have rejected that theory, we likewise reject Precision's second argument and conclude that Ms. Grimes's vote is supported by material evidence.

B. Vote of Committee Member Dodd Galbreath.

Precision makes two arguments regarding the vote of Committee Member Galbreath: (1) that his vote was "arbitrary and illegal" because "he misapplied and misrepresented the legal requirements for a buffer variance" and (2) that his reasoning was not supported by material evidence.

Precision's "arbitrary and illegal" argument is based upon its assumption that Mr. Galbreath "required Precision Homes to conduct a 'metric-for-metric' replacement of a 'native forest.'" As discussed above, however, the provisions of subsection (l) of the variance considerations included in Metro's stormwater regulations do not directly apply to Precision's variance request. *See* SWM Reg. § F1.1.2(1)(l)(ii). Moreover, in its brief, Metro acknowledges that the stormwater regulations do not require "metric-for-metric" replacement, an approach discussed by Mr. Galbreath in some of his comments at the hearing. Even Mr. Galbreath seemed to admit as much at the hearing.[8]

---

[8] Committee Member Galbreath stated:

> But you know, the—we have never had—and—and I've argued for this, and this is probably an administrative procedures issue that needs to be addressed. And I think a Zone 1 decision like this probably warrants this kind of discussion. And unfortunately it—it's not resolvable today.
>
> But we have—we have never proven that the mitigation provides a metric-for metric replacement; they—they don't have any quantifiable evidence of that today. And I know from a scientific standpoint that it is impossible to put a building on that site and mitigate the water quality and the water quantity benefits of—of a riparian buffer, metric-for-metric. It's—it's impossible.
>
> . . . .
>
> And Metro policy is moving towards a native riparian buffer on these sites. And I don't think we're setting a good precedent if we make it easy for someone to make that harder for Metro to do. I—I just—I think that's what's at stake here, more than just giving someone a little bit of a change to get FEMA to approve something that is surrounded by a flood risk.

Mr. Galbreath identified numerous other bases to explain his vote. He inquired and received an affirmative answer from counsel for Precision that the property was "within the area that flooded during the 2010 flood." Thus, Precision admitted that the lots would "flood during flood events above 100-year storm events." *See* SWM Reg. § F1.1.2(1)(b),(i), and (k) (variance considerations of danger to life and property, safety of access, and costs due to flooding of property). Later in the hearing, Mr. Galbreath discussed the fact that the properties at issue involved both floodplain and buffer regulations and the underlying policy concerns:

> The—we've got two issues on the table, the floodplain regulations and the buffer regulations. So we haven't talked about the buffer regulations yet. The Zone 1 variance applies as well. So—so I'll—I'll kind of back up from both before I—and—and—and talk more broadly about what I think is Metro policy here.
>
> . . . .
>
> So if—if we step back and look at this area we see Metro policy—to me—being applied in a very clear way that has not been applied in the areas where we have approved variances in the past.
>
> In this particular area, Metro is consistently acquiring properties along the riverfront that were developed, they were in the progress of being development [sic], and that had development potential. So clearly Metro policy is focusing on discouraging development on these parcels.
>
> What makes this case challenging is we've got a site that's in a gray area on the flood side of the question, but we've got a clear Zone 1 delineation. It's rare that we approve variances in Zone 1, so that doesn't make it a slam-dunk in terms of—of an approval of a variance.
>
> And we have this very clear Metro policy intent of not encouraging and facilitating development in these areas. We also don't have the same type of density surrounding the riverfront property where we have granted variances in the past, like we did for the downtown parcel that was in the Zone 1.
>
> There were adjacent properties that were already there. That represents a Metro policy focus for that site of allowing more development in areas that we'd rather not develop. But this site clearly has a different kind of policy focus.

Sections F1.1.2(g) and (h) direct the SWMC to consider, in making a variance determination, "[t]he compatibility of the proposed use with existing and anticipated development" and "[t]he relationship of the proposed use to the comprehensive plan."

Mr. Galbreath mentioned that building more houses would result in the necessity of rescuing more families in a flood. *See* SWM Reg. § F1.1.2.(1)(b),(i), and (k). He also commented:

- 12 -

There were all kinds of red flags that preceded this investment. There were all kind of red flags that—that are asking for not moving forward with this variance by virtue of all these parcels being purchased by virtue of—of the—the ordinance, demand development in floodways. This one is just too close to the risk. And I—I think we'd be making a major mistake by approving this variance. And that's—that's my position.

He further justified his position against the variance by explaining the importance of maintaining the buffer:

Okay. I—I—I need to provide my colleague with—with an academic paper about how riparian trees, which are water hungry trees, consume water quantity as well as clean water and filtered water. For example, an oak tree on—on an upland will consume 109 gallons of water a day. So—so we actually get water removed from floods by riparian trees. That's—that's been documented.

A Zone 1 buffer is the last line of defense for a stream. It is a critical zone for keeping the banks stable, and it's a critical zone for being the last filtering water gets. And it's a critical zone for pulling the last water out of a–last bit of water out of a flood that makes flood peaks a little bit smaller.

So I'd—I'd—I wouldn't be making this point as—as—as fervent as I am if it weren't such a highly vulnerable, high-risk area that Metro Council has identified as a high priority area—or it wouldn't be identified as—as a Zone 1 buffer. So—and—and that's—I think I've said all I need to say.

Contrary to Precision's assertion, Mr. Galbreath did not misapply the regulations regarding mitigation. He expressed his views regarding the appropriate standards and acknowledged that "it's not resolvable today." Mr. Galbreath provided a number of reasons to support his opposition to Precision's variance request, and we conclude that his vote was not arbitrary or illegal.

As to Precision's second argument, that Mr. Galbreath's reasoning was not supported by material evidence, Precision asserts that Mr. Galbreath's opposition was based upon only two reasons: that the lots were "too close to the risk" and that Precision's water quality mitigation efforts were insufficient. We have already rejected the latter argument above. (Furthermore, Mr. Galbreath's opposition to the variance request was supported by more than two reasons, as discussed above.)

We will now address Precision's objection to Mr. Galbreath's "too close to the risk" reasoning. Mr. Galbreath expressed a concern regarding whether allowing Precision to build the houses could cause increased financial risk to Metro taxpayers:

And—and—and I don't think what my good friend, the—the engineer I highly respect, Roy is saying—I don't think Roy is saying we should allow a variance here to increase the liability to the taxpayer. I—I—I don't think he's saying we should allow a house to be built here so the taxpayers has [sic] to come in here and buy a higher value, easily-at-risk flood damaged property when it's the investor who decided to take on the risk and not the taxpayer.

And if we're going to help the investor raise the risk to the taxpayer, I just don't think that's good policy. I—I don't think that's consistent with Davidson County's political culture to increase risk to the taxpayer and cost the taxpayers more money by adding value that's not there, that we don't have to approve, that we're not obligated to approve.

Metro Council stated years ago that—that these buffers have value. And we're going to regulate them and we're not going to allow development on them unless a panel of—of the applicant's peers find that a variance is warranted. And if—if this were any other site I would be looking for ways to help the investor recoup their investment.

The evidence showed that, after the 2010 flood, which was classified as a 500-year flood event, Metro participated in a grant program that allowed it to purchase homes that were "substantially damaged" (more than 50% damaged) as well as adjacent lots owned by the same homeowners. Mr. Galbreath's taxpayer liability concern is consistent with the provision in section F1.1.2(4) of the stormwater regulations stating that a variance shall be issued only upon a determination that the variance will not result in "extraordinary public expense."

Precision asserts that its proposed houses would not present a risk to taxpayers because, unlike the houses that were substantially damaged in the 2010 flood, the proposed homes would be built several feet above the 500-year flood line. Precision argues that, "Because the first floor is elevated 4 feet above the 2010 flood level, these homes would be 'out of harm's way,' not subject to substantial damage, and consequently unqualified for a similar buy-out program." Yet, as Metro staff pointed out at the hearing, there had been a number of catastrophic weather events across the country during the past year, so they did not consider the fact that property was "even inches or a foot above the 100-year flood elevation" to mean that there was no flood risk.

Overall, we cannot agree with Precision's assertion that Committee Member Galbreath's reasoning for his vote was not supported by any material evidence. As outlined above, Mr. Galbreath set forth a number of reasons to support his vote and, except as pointed out with respect to the mitigation regulations that do not apply here, the reasons dovetail with the applicable stormwater regulations.

C. Vote of Committee Chair Lance Wagner.

Precision's final argument challenging the denial of its variance request is that Chairman Wagner's reasoning was not supported by material evidence. Precision asserts that Mr. Wagner gave two reasons for his vote—the safety of first responders and concern over loss of the water quality buffer—and that there is no material evidence to support those reasons.

We begin with an examination of the relevant statements made by Chairman Wagner at the hearings.[9] He expressed concern about the safety of first responders in the event of flooding:

> I always have a concern about life, health and safety on these measures, too, because I—I—I remember some efforts to pull people from houses, and some life, health and safety issues during the 2010 flood.
>     So Miami Avenue, if I'm not mistaken, dead-ends to the east of these sites. And during the 2010 Flood, I'm pretty sure it was mostly cut off. And I'm—I'm pretty sure it was mostly cut off. And I'm—I'm just looking to Roger or anyone else to kind of verify that.
>     But I am a little scared that: Are we creating a life, health and safety issue by these being developed with residential houses?
> . . . .
> I think the difference between these properties and the properties on the other side of the road is that there will be three more families to rescue during a flood. That's—that's the difference.

The safety of first responders is a valid consideration under section F1.1.2(1)(i) of the stormwater regulations.

After the vote, Chairman Wagner expanded upon the reasons for his vote against the variance:

> I am not—I have a hard time divorcing the flooding issue, here because I—is it—it is very prone to flooding. And I think more development out here will be a sequius [sic] for first responders. I think it will increase the risk for Metro to come up there and provide services out there in a flood scenario.
>     And as I said before, it would have helped me if at least FEMA had weighed in above us and said, "Hey, you know, we agree this area is outside the floodway and the floodplain." You know, staff has—has

---

[9] As Precision points out, Chairman Wagner made some of his statements at the hearing on January 5, 2017, and others at the final hearing on April 6, 2017.

- 15 -

weighed in and said they're not in complete agreement with it being outside the floodplain because of the—the FEMA map saying so.

And I—I understand the—the elevations, and I've seen that. To me, the clarification on that would be to get FEMA to agree with that. And so that would have been, you know, my standpoint of a good—to have that to fall back on.

But right now I see this as burdening the taxpayers and burdening the city with more development in the area that doesn't need to be developed due to the flood risks.

And then the loss of the Zone 1—Zone 1 buffer is also a secondary concern of mine. So I think you've done a fairly good job of establishing how you would—how you would make up for a water quality loss, but I don't—I don't—it would be enough on its own for me. But with the—the flooding issues behind it, that pulls me to the no side.

These concerns are consistent with sections F1.1.2(4) and F1.1.2(1)(i) and (k) of Metro's regulations.

Precision objects to the concern regarding first responders. There was testimony that, at the height of the 2010 flood, water in the area was "midway up [the witness's] leg [in] the deepest part" and that the police did not allow cars into the neighborhood. Precision argues that there was no evidence that knee-deep water would present a risk to first responders sufficient to deny its variance request. The burden of proof was on Precision, however, to justify its entitlement to the variance. The safety of first responders and the additional costs of rescuing residents living in the proposed homes were valid considerations for the Committee under the regulations.[10]

As to Chairman Wagner's comments about mitigation, we agree with Precision that his comments suggest that, if that were his only concern, he may have been willing to grant the variance. Nevertheless, Chairman Wagner's concerns regarding first responders and public expense provide material evidence for his vote.

We conclude that the Stormwater Management Committee's decision is supported by material evidence and affirm the decision of the trial court. We, therefore, deny Precision's request for attorney fees.

---

[10] Precision also cites the Committee's decision to grant a variance for a seven-story multifamily building in another area. In reviewing the trial court's determination, we limit our analysis to the case at hand. We note, however, the previous discussion concerning the appropriateness of the Committee's consideration of Metro policy concerning development in a particular area.

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Precision Homes, Inc., for which execution may issue if necessary.


_____
ANDY D. BENNETT, JUDGE